### PAYNE, Director General of Railroads, v. SHOTWELL.

(Circuit Court of Appeals, Third Circuit. May 9, 1921. Rehearing Denied June 13, 1921.)

No. 2692.

1. **Railroads ⊕⟶327(1)—Automobile driver's duty to stop, look, and listen.**

The duty of an automobile driver to safeguard his safety and that of the traveling public on approaching a grade railroad crossing, by stopping, looking, and listening, is imperative, but the question whether a violation of that duty is negligence depends on the circumstances.

2. **Railroads ⊕⟶350(31)—Automobile driver's contributory negligence ·held question for jury.** ·

An automobile driver with an obstructed view, who stopped, looked, and listened 50 yards from a railroad grade crossing, and then permitted his car to drift quietly under full control toward the crossing, and who on reaching a point alongside the track from which he could see to the nearest curve, and from which the statutory crossing signals could have been heard, looked to the left and then to the right, when he first saw the unsignaling train which was almost upon him, and struck his car while he was attempting to cross, *held* not guilty of contributory negligence as a matter of law.

In Error to the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Action by Leila Shotwell, as administratrix, against John Barton Payne, Director General of Railroads and as Agent. Judgment for plaintiff, and defendant brings error. Affirmed.

Frederic B. Scott, of New York City, for plaintiff in error.

W. A. Dolan, of Newton, N. J. (Joseph Coult, Jr., of Newark, N. J., of counsel), for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS,. Circuit Judges.

BUFFINGTON, Circuit Judge. Showing jurisdiction by reason of diversity of citizenship, the plaintiff, as administratrix, brought suit against the defendant railroad company to recover damages for the loss of her husband, whose death, she alleged, was caused by the negligence of the railroad. She recovered a verdict, and on entry of judgment thereon, the railroad sued out this writ.

On the trial, the proofs tended to show the negligence of the railroad, but it was contended they also showed the deceased was himself so clearly guilty of contributory negligence that the court should have given binding instructions for the railroad. The trial judge refused this request and submitted the issue of the decedent's contributory neg-

---

⊕⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ligence to the jury. Accordingly the question here involved is whether the evidence in that regard was such that the court should, as a matter of law, have adjudged the decedent guilty of contributory negligence.

[1] The decedent was killed while driving his automobile over a grade crossing. He was an experienced driver, and his wife, who was a licensed and also an experienced driver, was on the seat beside him. The danger incident to such a crossing and the imperative duty of an automobile driver to safeguard both his own safety and the safety of those traveling on the railroad have been stated by this court. N. Y. Cent. & H. R. R. Co. v. Maidment, 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794; Brommer v. P. R. Co., 179 Fed. 577, 103 C. C. A. 135, 29 L. R. A. (N. S.) 924; D. L. & W. R. Co. v. Welshman, 229 Fed. 82, 143 C. C. A. 358, L. R. A. 1916E, 816. What we there said we now adhere to and emphasize, and the present case, which in no way detracts therefrom, is but an effort to apply those general principles to this particular case, which, like every other, must be adjudged on its own individual circumstances and surroundings. So doing, we have reached the conclusion that the question of the decedent's alleged contributory negligence was one which the court could not decide as a matter of law.

[2] The proofs in this case tended to show that on the afternoon of the accident, the decedent drove his automobile and stopped at a point on the road some 50 yards back from the defendant's single track railroad. From this point the road dipped between higher ground on each side and dropped by a gentle slope to the railroad. The railroad track from the left also passed through a cut or dip and had a sharp curve a short distance from the crossing. At that time, a fast express train, which was behind time, was liable to come from this left side, and a freight train was liable to come from the right side after the express passed. From the point where the decedent stopped the view of the track in both directions was so limited owing to the lay of the land and the foliage, that no helpful view of either track could be had, and indeed there was no place where an adequate extended view of the track could be had until just alongside the track. From that point a view of some 150 feet could be had to the left side by the person attempting to cross. The decedent stopped, as we have said, at the point 50 yards back from the track and listened for the noise or whistle of an approaching train. He heard no whistle or rumble. At this point we note a statute of New Jersey made it the duty of a train approaching a crossing to give warning by ringing of bell or blowing of whistle from 300 feet until the crossing was passed. By the verdict the fact is established that this warning the engineer, who was making this run for the first time and who was behind schedule time and running at 50 miles per hour, failed to give. In view of the fact that no signal was given, that if given it would possibly have held the decedent where he had stopped or warned him as he went forward, there was ground for a jury to infer that a driver might, with due regard to the situation, have concluded it was safe for him, with his machine under control and capable, as the proofs showed, of being stopped in

its own length, to proceed slowly, under the belief and faith that, if a train were approaching, it would evidence the fact by a signal 300 yards away from the crossing. Hearing no whistle or noise, the decedent started his car and went slowly down the slight declivity which led to the track, the machine, as the proof showed, making no noise whatever, and being under control. The only witnesses as to what followed were his wife and the engineer. The testimony of the wife was as follows:

"Q. Now, when you left the factory and started on the road toward the track, did you yourself make any observations as you approached the railroad track? A. Yes.

"Q. Which way did you look? A. Well, we looked both ways.

"Q. You say 'we'; do you know whether your husband looked or not? A. Yes.

"Q. Did he? A. Yes; I know that he looked.

"Q. And was there anything in sight? A. No.

"Q. Either way? A. No; absolutely nothing.

"Q. Where were you when you did that looking? A. Well, just before we started to go down the hill, we looked, and then we couldn't see again till you get very, very close to the track.

"Q. Why couldn't you see again? A. Well, there is a bank there, and there was an undergrowth, or there was grass and stuff growing up there to at least 2½ feet on top of the bank, and the bank runs along just so that, when the train comes through the bank, you cannot see just any more than the top of the train when that brush is off of there, and when it is grown up there you cannot see it at all until you get well, within 40 or 50 feet of the crossing, anyhow, before you can get a clear view of the track.

"Q. Now, when you get a view of the track, which way did you look first? A. Well, he looked down the track the way that train came that hit us.

"Q. That would be to your left? A. Yes; and as he looked my gaze followed his, so we both looked to the left.

"Q. How far were you away from the track then? A. Well, we were maybe 40 or 50 feet.

"Q. And how was he running his automobile? A. Very, very slow.

"Q. And going down grade? A. Yes.

"Q. Then what did you do? A. Well, then I turned and looked the other way.

"Q. Do you know whether he looked, or not, then? A. Yes.

"Q. How do you know that? A. Well, I sat right beside of him, and, as I looked, why he looked, too.

"Q. Was there— A. We always used to watch the train.

"Q. Was there any train due then? A. After that 3:38 comes in, usually there is a freight train. I don't know that it goes every day, but it goes real often; it pulls out from Newton and goes on down after the 3:38 comes in.

"Q. The 3:38 is the one that struck you? A. Yes.

"Q. And after that goes out, there is a freight due? A. A freight pulls out.

"Q. From the Newton station? A. Yes.

"Q. How many tracks are there? A. Just a single track.

"Q. As you approached this crossing, did you hear any signal? A. I did not hear anything at all.

"Q. Was the automobile making any noise? A. No; it was not.

"Q. How long did you continue looking towards your right? A. Well, we looked to our left first, and didn't see anything; then we looked to our right, and we—I don't suppose we looked real quickly; we just looked one way and then turned looked the other way; we didn't see anything either way; of course, as we looked back again, the train was right onto us.

"Q. When you looked back again to the left, how close was the automobile to the railroad track? A. Oh, well, we were right down close to the track I mean.

"Q. Well, give us some idea. A. Oh, we were right down on the track.

"Q. Were you actually on the track? A. Well, I cannot tell; looking over the head of the car, I couldn't actually tell you whether the wheels were on the track or not.

"Q. And how was the automobile moving at that time? A. Oh, we were moving very slow.

"Q. Did it actually stop? A. Well, I cannot remember whether we actually stopped or not; but I know that we were going very, very slow.

"Q. And what did you see when you looked again to the left? A. When we looked again to the left, the train was right there.

"Q. How far away from you? A. Oh, well, it seemed to be real close; I don't know. Oh, well, it wasn't the distance—well, possibly, from the corner there to the end of the room.

"Q. From where you are to the end of the room? A. No; maybe from that corner where that cuspidor is to the end of the room. It seemed as though it was that close to me, as near as I can remember.

"Q. At that time was there any signal from the train? A. Well, I cannot remember; it just seems as though there was a noise, a loud shriek, or something, and I was hit so quickly that I was knocked unconscious, and didn't remember so well.

"Q. Previous to that time, when you looked up and saw that train, had there been any signal? A. There was none.

"Q. Did you listen? A. Well, we were looking for the train, and naturally we would have heard it, if it had blown, I should think.

"Q. Were you listening? A. Why, yes, we were looking for the train, naturally listening for the whistle.

"Q. At the time that this train bore down on you, you say the distance from the end of the room to there, was there any bell being rung? A. No.

"Q. Sure of that? A. Yes."

The testimony of the engineer is as follows:

"Q. On September 8, 1919, you were the engineer of a train involved in a grade crossing collision near Newton? A. Yes, sir.

"Q. Now, will you tell to the jury just what you recollect with respect to the happening of this accident, the management of your machine—I mean your engine—from the time you left the station just east; I think that is Andover? A. Yes, sir. Why, after we left Andover, our next stop would be Newton; between that time, approaching this crossing where this accident occurred, I gave the proper whistles, two long and two short, and there is a caution block there that governs the signals down at the station.

"Q. Now, just a moment: may I interrupt you? Will you step down and look at this map? there is a signal here? A. That is the caution block right here; that governs the signals down at the Newton station, and after I blew the whistle for the crossing, I watched next for that signal on account of the freight train in Newton I knew was there; if they were using the cross-over down at the station, I had to figure on stopping there on account of they don't flag there, on account of the yard limits; when I see the signal was clear, I looked next for the crossing; I saw this automobile just coming down slow on the crossing; that was in the neighborhood, I judge, of 250 feet.

"Q. What kind of a caution signal is this—a semaphore signal? A. Yes; automatic signal.

"Q. The arms are how high from the ground? A. On top I should judge in the neighborhood of 50 feet probably.

"Q. You say, as you approached the crossing, you looked up at this caution signal? A. Yes, sir.

"Q. Then, after you looked at that and saw it clear— A. Saw it was clear.

"Q. Then you directed your attention to the crossing? A. To the crossing, and as soon as I saw—coming around there the curve is very sharp—I could see the crossing, I saw this automobile, looked to me as if it was just about stopped, just moving on the crossing. As soon as I saw it, I threw the brakes into emergency and blew the whistle, gave one long blow, and struck the car, probably a very short time, only 250 to 300 feet.

"Q. About how fast were you traveling at that time? A. I should judge between 45 and 50 miles; in the neighborhood of that.

"Q. And for how long a time had you been traveling at that—how long a distance had you been traveling at that rate of speed? A. Not very long, because it is· upgrade from Andover ·to what we call the slate cut; then it is downgrade from there down below this crossing a short distance, about half way to the shoe factory, probably 300 yards.

"Q. Will you tell the jury if you used your bell on· that trip up from Netcong, by way of Andover, to Newton on that day, and, if so, how the bell is operated? A. The bell is operated by air, and I started\ the bell ringing, coming over the slate cut, and the bell was still ringing.

"Q. Where did you start it? A. Coming over the slate cut, there is a cut just west of the slate cut, and I left the bell still ringing, and I blowed the whistle for both crossings, and the reason I know the bell was still ringing is, · after this accident occurred, the first thing come to my mind, had I done everything that was for me to do to avoid the accident? I knew I had blowed the whistle, and the bell was still ringing; I went up in the cab shut the bell off after I see Mr. Shotwell on the front end.

"Q. Do I understand you to say, after you brought the train to a stop, you went out of your cab? A. Yes, sir.

"Q. And helped Mr. Shotwell; he was on the engine some place? A. Yes, sir; he was on the front end of the engine.

"Q. When you found that you couldn't do anything for him, then you went back to your cab? A. Went back to my cab, and shut the bell off, and tooted the whistle; by that time Mr. Zeke was coming down; he was the conductor.

"Q. Can you tell us about where you put that bell on? A. Why, west of slate cut.

"Q. How far is that place west of slate cut, where you put your bell on from the crossing whistle signal? A. Oh, probably quarter of a mile; anyhow the bell was ringing all the time; I left it still ringing."

Under this situation we feel it is clear the court would not have been warranted in holding, as a matter of law, the decedent guilty of contributory negligence. On the contrary, the situation was one which made it the province of a jury to determine whether, in view of all the circumstances of the case, the decedent did, or omitted to do, anything contributing to his safety which the situation required or made possible. He had stopped and listened for the whistle; he was approaching the track slowly; the machine was under control and making no noise; his wife and he were alert, both looking and listening, both evidently relying on the fact that no whistle or bell was sounding.

Certainly, on the question of due care and the fact of contributory negligence, there was such a possible divergence of view on the part of fair-minded men that one might find the decedent had done everything possible and omitted nothing which contributed to his safety, and another fair-minded man find otherwise. The decedent stopped at the top of the grade and listened. He knew a train approaching in either direction was bound to whistle when 300 feet distant from the crossing, and keep whistling until the crossing was passed; he heard nothing; he could not foresee or presume that the engineer would negligently fail to give the statutory warning. He did not attempt to dash across the track, chancing the consequences, but let his car drift down the slope at slow speed, at which it was under control, and, under the proofs, could be stopped in its own length. As the car descended, it made no noise, and the nonsounding of the whistle of the approaching train tended to assure him he could cross in safety. At the first oppor-

tunity, he looked to the left for the freight train, and saw none, and then to the right, only to find that the approaching, unsignaling train was so close upon him that in his effort to avoid it, his car was struck.

To say that the accident would have been avoided, had he then stopped, with the nose of the machine close up to the track, and that failure to then stop it was contributory negligence begs the whole question. Perhaps he could have done otherwise than he did, when suddenly required to act in the position then confronting him; but, assuming he might have instantaneously stopped the car and that it would have been wiser to do so, instead of attempting to cross, it still remains that there was ground from which a jury might fairly infer that his attempt to cross was not the breach of an absolute duty to then stop, but was rather a mistake of judgment, made by a man confronted by an unlooked for peril, unexpectedly brought about by the unanticipated and misleading negligence of the company in failing to blow the crossing whistle. Indeed, the situation as a whole was one where men of reasonable mind might reasonably differ in their conclusions, namely, where one such man might be of opinion that the decedent did not act with due regard to his safety, and where another could find he had done nothing and left undone nothing, in the way of proper care and forethought.

Under such circumstances, the court committed no error in refusing to give binding instructions.