## BALTIMORE & O. R. CO. v. SHAW.

Circuit Court of Appeals, Third Circuit.
May 14, 1929.

Rehearing Denied November 2, 1929.

No. 3824.

John W. Huxley, Jr., of Wilmington, Del., for appellant.

W. W. Knowles and Wm. T. Knowles, both of Wilmington, Del., for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and McVICAR, District Judge.

BUFFINGTON, Circuit Judge. In the court below Raymond E. Shaw recovered a verdict against the Baltimore & Ohio Railroad Company for damages caused, as he alleged, by the negligence of said company in its train striking the truck he was driving. On entry of judgment the railroad took this appeal. We assume the proof that the failure of the train to give notice by whistle or bell of its approach to the crossing is shown, and pass on to the underlying question, viz., whether in view of the testimony produced by the plaintiff, the trial judge should have held Shaw guilty of contributory negligence and given binding instructions in favor of the defendant.

The collision occurred at Christiana hundred, New Castle county, Del., near the town

of Elsmere, where the Du Pont Road crosses the four main through tracks of the Baltimore & Ohio Railroad system. While the trains on the railroad are frequent in number and high in speed, it is, to our mind, clear that as the train and truck moved toward the crossing, there was no occasion for this accident. Shaw resided in the neighborhood, frequently drove over the crossing, knew it had a watchman; it was daylight and the weather was clear. A railroad watchman was·on duty, and the broad, straight highway could be seen for a long distance in both directions, and no automobiles were in sight in either direction. We stop at this point to say that there is nothing in the fact that the watchman at this moment was looking toward the Elsmere end of the highway from which negligence on his part could be inferred. He could not look to both ends of the highway at once nor stand on both sides of the crossing, and if his looking toward Elsmere were evidence of negligence toward travelers approaching along the other end of the highway, it follows his looking toward the other side of the crossing might with equal force be said to be negligence toward those approaching from Elsmere. With no one approaching on the highway in either direction, it is clear that the watchman as the train approached was at a place where he could safeguard travelers coming in either direction on the Du Pont Road. Such being the case, how and by reason of whose acts of omission or commission did the collision occur?

On the southerly side of the railroad's right of way, and within 3 or 4 feet of its east-bound main track, and therefore on the opposite side of the crossing from where the watchman stood, is a watchman's box which stands in the angle made by the Du Pont Road crossing the tracks. From the easterly side of that highway at this point and just clearing the watch box, and at a point variously stated by different witnesses from 4 to 12 feet distant from the railroad track, a private road runs in an easterly direction some 600 feet to the plant of the Diamond State Fiber Company. As the train approached the crossing, Shaw, his truck loaded with fiber, drove from the fiber plant toward the watch box, intending to turn to the right at the watch box and cross the four tracks. His situation as he came along this road he thus describes:

"I came down from the Diamond State Fiber Mill and came out along the railroad. There was a road that comes out along the railroad to the Du Pont road, and on my left —on my right, coming out along the railroad, there is a bank there, probably about five feet high. And on top of this bank is bushes—poison ivy and sassafras bushes, straight in front of me. On the western side is a big hedge, probably about seven or eight feet high.

"Q. What is seven or eight feet high? A. This hedge is. And the bank there leading on the hedge is from four and one-half to five feet high with the hedge on top of it. That hedge kind of hangs over, over the railroad like, and in doing so—coming out along this railroad I was listening for a train—as I came to the Du Pont road I was looking for tourists, you know, motorists, coming by. They were not coming. While I was looking for trains, I didn't see no trains and there were none coming. I started to make the turn to run across the railroad. I saw the watchman standing on the left of Du Pont road across the track with his signal down and looking towards Elsmere. * * * There is a big hedge along the Du Pont road there, right over the railroad about four feet, I guess, or three feet. And there is a bank runs out there about five feet high and on this bank stands a hedge. The hedge runs all the way down to the road and clean up to the railroad.

"Q. How about the right of way of the railroad? A. Down near the right of way of the railroad there was a bank down there and a fence on top of the bank. There was poison ivy and sassafras bushes all growed up along this fence. Along that fence about a hundred feet, I guess, there is a garage. There are buildings there anyway. I judge it is a garage. There is a building there of some kind. I don't know whether it is a garage or what it is. It sets right along there, and there is a big lot of trees along that fence. That is, the brush comes up along that road and comes up three feet or four feet and hangs over, kind of hangs over that railroad and is pretty thick. * * *

"Q. As a matter of fact, when you come down that Fiber Mill road you looked directly down it, did you not? A. If it would not be for that hedge, you could see down it, yes.

"Q. How high is that hedge? A. Seven feet high.

"Q. That was the second of March? A. Yes, sir.

"Q. Was the hedge in full foliage that time of year? A. No, sir. The leaves was thick. They had fallen off and hung in bunches. You could not see through them."

As to the vision of one coming down this

private road, Shaw's testimony as to a sight of the watchman was:

"Q. I ask you whether or not there was any point down this Fiber Mill road where you can see this watchman? A. No, sir. That I couldn't see."

As to the view of the crossing his testimony was:

"Q. So that the watch box does not obstruct your view of the crossing when they come down to the Du Pont road? A. Yes.

"Q. It does? A. Yes."

As to one's ability to see an approaching train, his testimony was:

"Q. You could not see a train when you were turning out of the Fiber Mill road? A. I could not see a train.

"Q. You could not see a train? A. No.

"Q. Was there any sun in your face? A. Bushes stopped me from seeing."

And what was earlier quoted:

"I had to approach nearly within two or three feet of the track.

"Q. Before you could see down the track? A. Before I could get a clear view of a train approaching me from the west."

This latter was the track on which the train that struck him was coming. It will be here noted that not only was there danger from trains passing on any one of the four tracks, but watch had to be kept to the other side of the private road to avoid automobiles coming on the right-hand side of the Du Pont Road, which might strike Shaw's truck from the rear as it turned around the watch box to make the crossing. This danger made him look to the left, which he did. "As I came to the Du Pont road I was looking for tourists, you know, motorists coming by."

The situation when an automobile turns around the watch box to make the crossing was thus described by Shaw:

"The Fiber Mill road runs right up to the crossing, almost to the crossing of the Du Pont road. You see, here is the road, the railroad coming here (indicating), and here is the Du Pont road. The railroad comes this way, and here comes the road out of the fiber mill. They all join right here. When you make the turn, the rear of your truck is still in the Fiber Mill road. That will leave you about three feet from the track. You see it all twines right there together, coming right there together, to the railroad right of way. * * *

"Q. So that the watch box does not obstruct your view of the crossing when they come down to the Du Pont road? A. Yes.

"Q. It does? A. Yes."

Referring to the distance of the railroad track to the Fiber Mill road, Shaw stated:

"It is about four or five feet. * * *

"Q. You say it (the Fiber Mill road) comes out within four or five feet of the railroad. Do you mean the railroad track or the edge of the railroad right of way? A. The railroad track."

He states the watch box was about 7 feet high and 5 or 6 feet in diameter, and that "there was three or four feet between the watch box and the southerly rail of the eastbound track."

Indeed, the dangerous situation is expressly stated in the declaration, which avers, "There were many posts, poles, wires and bushes near the southerly side of said railroad and on the westerly side of said Du Pont road at said intersection which prevented travelers traveling in a northerly direction on said highway, at or near said intersection, from properly seeing and observing approaching engines and trains, from the west coming eastward on said line of railroad, at said intersection."

Now the proofs show that Shaw drove his truck down the private road at a speed of 5 or 6 miles, and, without stopping, made the turn around the watch box and attempted to cross the track, his testimony being, "I started to make the turn to turn across the railroad. I saw the watchman standing at the left of the Du Pont road across the track with his signal down and looking toward Elsmere." Now in so doing was he exercising due care for the safety of himself and of the trains of the railroad and their passengers?

Turning back to a time when the questions of automobiles and grade crossings of railroads were beginning to arise, this court 20 years ago, after very careful consideration of this then oncoming question, gave in Railroad v. Maidment, 168 F. 21, 21 L. R. A. (N. S.) 794, its views in these words:

"With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have and will continue to arise. At no place are those relations more important than at the grade crossings at railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive, followed by a heavy train, is subjected to slight danger by a crossing foot passenger or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train. And when to the perfect

control of such a machine is added the factor of high speed, the temptation to dash over a track at terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject. He cannot drive close to the track, or stop there, without risk of his horse frightening, shying or overturning his vehicle. He cannot well leave his horse standing, and if he goes forward to the track to get an unobstructed view and look for coming trains he might have to lead his horse or team with him. These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse. It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public. If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized. In the case of trolleys crossing railroads at grade, the practice is general for the conductor to go ahead and from the track signal the halted car to advance. This would, of course, be impracticable as a rule for automobiles; but it illustrates the trend of the law, as the size of crossing vehicles makes collision with them more serious, to enforce greater safety precautions."

Now while no absolute rule of conduct can be laid down, because necessarily each case stands on its own facts, the general principle is that where an automobile driver in attempting a passage takes, as was there said, chance instead of precaution, and makes chance, not sight, the guarantee of his safety, he is not taking due care; and lack of due care which brings about an ensuing accident is contributory negligence.

Later, in Brommer v. Railroad, 179 F. 577, 29 L. R. A. (N. S.) 924, this court referred to the Maidment Case and said:

"In the Maidment Case, supra, we said:

'The duty of an automobile driver approaching tracks, where there is restricted vision, to stop, look, and listen, and to do so at a time and place where stopping and where looking and where listening will be effective, is a positive duty.' This rule is conducive to safety, and observation and experience have deepened our conviction of its soundness. We therefore adhere to it and now restate it. * * * The power, speed, and control of automobiles are new factors in the crossing of railroads. They tempt a reckless driver to make flying crossings. On the other hand, they afford elements of safety and convenience to a careful one. The law contributes to the rational enjoyment of the automobile, to the safety of its occupants, and to the welfare of the railroad traveling public, when, in these early cases, it holds the automobile drivers rigidly to the rule laid down in the Maidment Case."

In referring to these cases we have not overlooked other cases where recoveries have been allowed by this court, but they differ in substantial features from the instant case. In Ryan v. Delaware, L. & W. R. Co. (C. C. A.) 8 F.(2d) 138, the driver was without the helpful aid of a watchman, and the circumstances were such that he had taken every precaution to insure his safety. In Payne v. Shotwell (C. C. A.) 273 F. 806, there was no watchman. The driver and his wife, both experienced in driving automobiles, were keenly on the lookout, approached the track very slowly, and when near it had a vision of 150 feet in one direction, and as therein stated, "did not attempt to dash across the track, chancing the consequences, but let his car drift down the slope at slow speed at which it was under control, and, under the proofs could be stopped at its own length." Delaware, L. & W. R. Co. v. Welshman (C. C. A.) 229 F. 82, L. R. A. 1916E, 816, was a case where the flagman, who did not see the train coming in an opposite direction from the one that had just passed, raised the gates, and when on the network of tracks the car was struck by a train, which neither the driver nor the watchman saw coming.

True, the principles laid down in the Maidment and Brommer Cases have been questioned. In B. & O. Railroad v. Goodman, 10 F.(2d) 60, the Circuit Court of Appeals of the Sixth Circuit, referring to the Maidment Case as being specially cited and urged in the case before it, said: "That decision and others, including Bradley v. Missouri Pacific (C. C. A.) 288 F. 484" (where the Circuit Court of Appeals for the Eighth Circuit had cited the Maidment and Brommer

Cases), "apply the rule more rigidly against the user of the highway than this Court is willing to do." This conflict between the Circuit Court of Appeals of the Sixth Circuit and those of the Third and Eighth was, as we view it, met by a certiorari from the Supreme Court of the Goodman Case, supra, and in 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, it was reversed, the court laying down this principle: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk."

Applying the principle of these decisions of the Supreme Court, of the Third and the Eighth Circuits, to the present case, we are clear that the situation was one of uncertainty and required him to stop before attempting this four track, trunk line crossing; or, as said in the Maidment Case, "to settle that uncertainty on the side of safety." There was no necessity for him to alight. The watchman was there and the sounding of the truck's horn would have caused him to turn and give the proper signal to come or wait. Shaw's view was shut off by the watch box until he made a turn which brought the front of his truck within three feet of the rail, a closeness which might in itself be termed foolhardy and needlessly venturesome. But instead of stopping to get the watchman's help or having any assurance of safety, he went on, and as a result of his failure to take proper precautions he covered the intervening two or three feet, crossed the rail and the train immediately struck the truck.

We here take occasion to say that where a driver makes a chance crossing and narrowly escapes a train, that case never comes into court and consequently there is no discussion or adjudication of his contributory negligence. So we have come to associate contributory negligence wholly with failures to make the crossing. But reflection will show that contributory negligence occurred when the driver chanced the crossing, and is not measured by his subsequent success or failure to make the crossing. In this case, if Shaw had been a minute earlier he would probably have escaped injury, but he would have been equally guilty of negligence in attempting the crossing.

We also note that we have not overlooked the contention and testimony of Shaw that the flagman's conduct caused the accident, viz.:

"Q. Now, you say that just as you came out of the Fiber Mill road you saw the watchman throw up his hands? A. Yes, as I was making the turn.

"Q. As you were making the turn? A. Yes.

"Q. Were you out of the Fiber Mill road? A. I was just making the turn.

"Q. Did you stop between the time you made the turn and the railroad track? A. No. I saw the watchman was standing on the side of the road. If the watchman had been in his proper place, I would have stopped. If I had not seen him standing on the side of the road there, I would have stopped. I had seen him standing there time and time again to let motors come back and forth. If he had been there in his proper place, I would have stopped, but he was standing there, and I thought it was all right."

As we have said, we see no evidence of any neglect of duty by the watchman in looking up the highway for travelers from one direction and therefore with his back to the other. But assuming for present purposes it was neglect of duty, yet the fact is that Shaw knew a watchman was kept there, the watchman was there, and, if he was neglecting his duty, a call of the truck's horn would have at once recalled him to duty. In Brommer v. Railroad, supra, we said, and we think the principle there stated is applicable here: "Indeed, as we view the situation, the plain neglect of duty by the flagman did not relieve the persons attempting to cross from the duty on their part of looking and listening (Berry v. Penna. R. R., 48 N. J. Law, 141, 4 A. 303), while his presence made it possible for them to call to him and ascertain that the crossing was safe." Coming into the highway where he had no view of tracks or crossing, his view of watchman and tracks shut off by the watch box until he made the turn, and making the turn bringing the machine within two or three feet of the rail, it is clear to us the situation was one where due care required Shaw in coming suddenly from the blind, private road and turning into the highway, to stop, and from the watchman learn whether he could in safety undertake to cross the four tracks of this trunk line

railroad where trains ran with the frequency and speed incident to such a system. There was no reason why he could not with proper precaution cross in safety, and to us it is clear he made chance and not precaution the guarantee of his safety, and that his lack of care brought about the collision. The danger incident to chanced crossings, the encouragement of drivers to undertake races against trains, are lessened by the firm adherence by the courts to making care, precaution and safety first, and not chance, luck and daring crossings the proper standards for automobiles at grade crossings.

The judgment below is therefore vacated, and the record remanded for procedure in due course.

DAVIS, Circuit Judge (dissenting). I am constrained to dissent in this case. I agree with the law generally as above stated, but it is not applicable to the facts in this case and inferentially overrules the established law of this circuit. The facts in the cases cited in support of the majority opinion are entirely unlike the facts in this case and the law of those cases is not controlling here.

When Shaw approached the crossing, he saw the flagman standing by the side of the road across the tracks. Plaintiff's counsel says that the flagman could and did see Shaw, but, be that as it may, he could and should have seen him. However, he gave no sign or warning to Shaw, or in any way indicated that a train was approaching. He had been stationed at this particular crossing for a long time, and Shaw properly assumed that he was both competent and was doing his duty, and that he could cross in safety. He therefore should not be nonsuited because he did not stop, look, and listen before he attempted to cross the tracks.

In the case of Erie Railroad Co. v. Schmidt, 225 F. 513, 517, this court said: "If a flagman is on duty, the traveler may assume that such employee will give sufficient warning of danger. And, if the traveler be nevertheless injured or killed, no action brought for such injury or death shall be defeated by the mere fact that the traveler did not stop, look, and listen." We quoted and approved this language in the case of D. L. & W. R. Co. v. Welshman, 229 F. 82, L. R. A. 1916E, 816. The principles announced in those cases, while based on statutes, are declarative of the law generally and their ap-

plication to the facts of this case justified the rulings of the District Court.

In addition to the failure of the flagman to warn Shaw of the approaching train no bell was rung and no whistle was blown by the locomotive. Under these circumstances the court could not say as a matter of law that Shaw was guilty of contributory negligence in not stopping, looking, and listening before attempting to cross the tracks. When Shaw was on the track, the flagman rushed toward him, threw up his hands, stopped the truck, and so confused Shaw that he stalled his engine. Before he could get out of the car, a train struck it and injured him.

The learned trial judge charged that:

"If the plaintiff was approaching that track at a rate of speed which would have enabled him to pass over that track in safety and the defendant's watchman knew or should have known, in the exercise of reasonable care, that the plaintiff could get over in safety, if he were not stopped and the defendant's flagman negligently under those circumstances stopped the plaintiff, then, of course, you would find that the injury was due to the negligence of the defendant, because the defendant is charged with negligence of its agents, of whom it is undisputed that the flagman was one."

"If the flagman, in the exercise of reasonable care and prudent judgment, knew or should have known that he could not have stopped Shaw or that Shaw could not have stopped the automobile in which he was riding, considering his rate of speed, before getting upon the track, and, if the watchman in the exercise of that same discretion, prudence and care, knew or should have known that Shaw could have passed over and thus avoided injury, then it was the duty of the watchman to permit him to pass, but that permission to pass is predicated upon the knowledge that he could not stop, in time to avoid running upon the track."

The charge was free from error, and the verdict settled the facts. The judgment, in my opinion, should be affirmed.

### On Application for Rehearing.

PER CURIAM. After due consideration of the matters raised in the application for rehearing, we find no reason to change our former view, and it is therefore refused. The mistakes in local topography do not affect the conclusion reached and will be corrected in the opinion.