**McCLAIN v. MISSOURI PAC. R. CO. et al.**
**RAY et al. v. SAME.**

**Nos. 6271 and 6272.**

Court of Appeal of Louisiana. Second Circuit.

Jan. 13, 1941.

George V. Cotton and Theus, Grisham, Davis & Leigh, all of Monroe, for appellants.

Hudson, Potts, Bernstein & Snellings, of Monroe, and Young & Watson, of St. Joseph, for appellees.

HAMITER, Judge.

In a railroad crossing accident happening in Tensas Parish, Louisiana, during the afternoon of October 11, 1937, Mrs. Louella Smith Ray and Mr. W. H. McClain lost their lives. They were occupants of the automobile struck by the train.

Growing out of the unfortunate occurrence are these two tort actions in which damages for the deaths are demanded. One was instituted by Mrs. W. H. McClain, the surviving widow of decedent McClain; while plaintiffs in the other are John Ray, the surviving husband of Mrs. Ray, and O. L. Smith, legal tutor for Mrs. Ray's minor children that were born of a former marriage.

Named as defendants in the actions when commenced were the Missouri Pacific Railroad Company, a corporate entity which at the time of the accident was seeking to effect reorganization under the provisions of Section 77 of the Federal Bankruptcy Act, 11 U.S.C.A. § 205, and Guy A. Thompson, its duly appointed and qualified trustee. Subsequently, under an agreement of counsel, both suits were dismissed as against the Missouri Pacific Railroad Com-

pany; and there were entered on behalf of Guy A. Thompson, trustee, full appearances, together with waivers as to all questions regarding the legality of the proceedings.

For the purpose of this opinion, in the interest of convenience and clarity, the Missouri Pacific Railroad Company will be considered and referred to as the defendant.

Various charges of negligence on the part of defendant, its agents and employees, to which reference will hereinafter be made, are urged by the plaintiffs in their petitions as causing the accident and deaths.

Defendant denies the allegations of negligence, and further denies responsibility for the mishap. Alternatively it pleads that both decedents were contributorily negligent.

As the issues formed by the pleadings in the suits, except as to the quantum claimed, are identical, the cases were consolidated for the purpose of consideration in the district court. They are similarly treated here.

A lengthy trial of the merits was had, during which a record of voluminous proportions was constructed; and after its completion, and a study of the cases had been made, the district judge rendered a well considered written opinion, together with judgments in keeping therewith, ordering the rejection of the demands of all plaintiffs. These appeals followed.

The locus of the accident is known as Balmoral Crossing and is about four miles north of Newellton, Louisiana. This crossing is formed by the intersection at a slight angle of a public graveled highway, running generally east and west, and defendant's railroad tracks and road bed which course north and south. The tracks are straight for miles in each direction and are located on a fill or dump three to four feet above the surrounding flat, cultivated, farming lands. Because of the elevation of the tracks, there is a slight incline in the graveled highway at and near the crossing.

Adjacent to the highway on each side of the railroad right of way, at a point 54 feet from the center line of the tracks, is located the familar and customary warning sign in large letters—Louisiana Law Stop. West of the tracks and south of the gravelled road, when the accident occurred, was situated a field of dried corn stalks. This field extended to within 20 feet of the highway and 36 feet of the track's center line; it did not, however, serve to prevent occupants of automobiles, using the highway in that vicinity, from seeing trains approaching the crossing.

The highway in question accommodates considerable traffic, and is used extensively by persons residing in the Newellton section of Tensas Parish and by others visiting that territory; but it is not one of the trunk lines or main arteries of traffic in the Louisiana Highway System.

The railroad tracks are employed by defendant in the daily operation of a train from McGehee, Arkansas, south to Ferriday, Louisiana, and return, the distance between the two points being 165 miles. The run begins at McGehee in the early morning, while the return trip from Ferriday starts in the afternoon.

The train involved in the accident consisted of a motor car, which was propelled by a gasoline engine and electric motors, and a passenger coach. Provided therein were facilities for handling mail and baggage. The engineer, in the operation of the train, sat alone in the extreme front portion of the motor car. Unobstructed vision to his left, front, and right was afforded him by glass windows that existed on each side and in front.

Mrs. Louella Smith Ray, one of the unfortunates, lived with her children and her husband in Newellton. Her age was 29.

Decedent McClain, who was a timber contractor 60 years of age and a close friend of the Ray family, resided at a lumber camp about one and one-half mile from that town. His wife made her home with a daughter and son-in-law in Natchez, Mississippi. She received visits and funds from her husband regularly, however, and occasionally journeyed to the camp to see him.

Other friends of Mr. McClain were Mr. and Mrs. G. H. Scott who engaged in farming on the Cammack Place located a few miles west of Balmoral Crossing. Mrs. Scott had planted quantities of seed provided by Mr. McClain, and the latter was privileged to gather vegetables from her garden whenever he so desired.

In the afternoon of the fateful October 11, 1937, McClain called at the Ray home, as had been previously arranged, to drive Mrs. Ray and a Mrs. Owens, who was living there, to the Scott garden for the

purpose of obtaining vegetables. Mrs. Owens, because of illness, was unable, fortunately, to make the trip. With Mr. McClain operating the autombile, a 1935 Chevrolet, and Mrs. Ray seated beside him, the journey began. They drove north from Newellton until the mentioned gravel highway was encountered; then they proceeded west along that road, over the Balmoral Crossing, which both had previously often traversed, and eventually reached their destination. They secured the desired vegetables, using about thirty minutes to do so, and started their return trip to Newellton along the same route.

As the Balmoral Crossing was being negotiated, from the west to the east, defendant's train struck the automobile. Mr. McClain was killed instantly. Mrs. Ray received injuries from which she died about an hour later. The train was on its northbound run. It had left Newellton, four miles south of the crossing, a few minutes earlier and at its scheduled time of 4:35 P. M. o'clock. Daylight, clear and dry weather, and good visibility prevailed.

A theory concerning the accident advanced by plaintiffs is that the crossing was defective, worn down, unsafe and dangerous, and by reason thereof the McClain car stalled or stopped while in the act of traversing it. For permitting such alleged condition to exist, defendant is charged with gross negligence. The allegations of the petitions relative to that theory and charge, as summarized in the brief of plaintiffs' counsel, are as follows:

"That on and prior to October 11, 1937, (the date of the accident) the defendant in violation and disregard of its obligation, had permitted said crossing to become very bad and dangerous in that the gravel road at the point of crossing had been allowed to become washed and worn down below the level of the railroad tracks so that said tracks and rails at the crossing were exposed in their entirety above the surface of the gravel road and in fact one inch or more of the cross ties themselves were likewise exposed above the surface of the gravel; that the rails were approximately five inches higher and, as a consequence, the surface thereof at the time extended to a height of some six inches or more above the surface of the gravel road at the said crossing making it very dangerous for motor vehicular traffic, and constituting in fact a veritable trap for the motoring public, particularly since the crossing it-

self was at an angle with the tracks, necessitating that an automobile negotiating said crossing "jog" up and over the rails, one wheel at a time.

"That in fact due to the worn condition of the gravel at said crossing and to the other conditions above described, said crossing had become so dangerous and hazardous as to constitute a trap for the motoring public and that (on information and belief) the jolting occasioned by attempts to negotiate said crossing, had on numerous occasions immediately prior to the accident caused the engines therein to be "killed" and the automobiles to become "stalled" on the crossing and on the tracks until the driver could start the engine again and complete the crossing; further that all of said facts were in fact known or should have been known to defendant and its agents, servants, and employees charged with the maintenance of said crossing.

" * * * That (on information and belief) as said car was driven by Mr. McClain up and onto said railroad track the jolting occasioned by the condition of said crossing above described "killed" the motor, bringing said automobile to a complete stop and "stalling" it in the middle of said tracks and that, while said automobile and its occupants were thus trapped on said tracks and before the driver could start his engine and complete the crossing and before the occupants could open the doors of said car and jump out, said automobile was struck squarely in the middle by defendant's train—the impact knocking the car and its occupants many feet up the track, inflicting severe and painful injuries to both and resulting in their deaths."

The district judge found as a fact, as his written opinion discloses, that Balmoral Crossing was in a "fair, average condition" and "was passable"; and he concluded that "the defendant was not guilty of such neglect in the care and maintenance of the crossing as would incur liability in the present case."

In connection with the mentioned finding, he made the following pertinent observations:

"The evidence relative to the condition of the crossing is definitely contradictory. The plaintiff placed six witnesses on the stand, who testified as to its bad condition. John Ray called it, ' "an awful bad crossing" ', stating, ' "that the rails were about five or six inches above the level of the road, that

you could not cross it in high gear, or at any speed, or if you did you would turn over"' —' "that it was an awful high incline and that the Johnson grass grew as high as your head."' ' "That the hole between the rails was about six or eight inches deep."' Other witnesses stated that the ' "rails extended about five or six inches above the surface, that the track was rough;"' ' "bad condition in the middle of the crossing,"' ' "unsafe to cross without changing of gear;"' ' "bad crossing, so rough it killed motor;"' ' "one rail was exposed, could only be crossed in the lowest gear, you could get into."' Mr. J. H. Rollins, Highway Superintendent, a man of good reputation in the community, ' "considered it bad."' Mr. Elliot Coleman, Sheriff, stated, ' "the rails projected five or five and a half inches above the cross ties. The cross ties were exposed about one-half to three-quarters inches above the gravel, and exposed the entire width between the rails; that he always had to cross the crossing in low gear."'

· "This Court has counted up to thirty witnesses who testified on behalf of defendant and in rebuttal of plaintiffs' testimony as to the condition of the crossing. These several witnesses testified that crossing, ' "was in good condition,"' ' "good shape,"' ' "definitely smooth,"' ' "perfect,"' ' "in good average condition,"' ' "fair average crossing,"' ' "nothing to cause a motor to stall,"' ' "no trouble in crossing,"' ' "no trouble in crossing with equipment,"' ' "crossing was never impossible,"' ' "definitely no danger,"' ' "nothing dangerous or defective,"' ' "always seemed a very good crossing,"' ' "ordinary country crossing,"' ' "smooth level crossing,"' and many other descriptions.

"Unfortunately for this Court, most of the witnesses who testified for both plaintiff and defendant were persons of unimpeachable character and whose reputation and standing in the community was of the highest.

"With reference to the status of the crossing at the time of the accident, search has been made in vain for some uncontradicted, clear cut testimony, that would enable the Court to determine the true and actual condition of said crossing on the date of the accident.

"Such testimony not having been found, it has been necessary to view the evidence as a whole; after having done so, and after having evaluated same as accurately as possible, this Court has reached the conclusion that, whereas, the crossing was not in prime condition, that it was in a fair, average condition, and to quote one of the witnesses, Honorable George H. Clinton, a respected, honored, trusted, citizen of Tensas, now deceased, ' "It was just simply an ordinary crossing, such as you would find on practically any plantation—it was just about the average."'

"While the evidence relative to condition of crossing is deemed equal, as far as the credibility of the witnesses is concerned, it is overwhelming in preponderance, in support of the contention that the crossing was passable and could be readily traveled by any ordinary car, truck, or other vehicle, in average operating condition."

■ All of the testimony of the numerous witnesses has been carefully and closely studied by us, and our consideration does not furnish the conviction that the announced finding of the district court is manifestly erroneous. On the contrary, the huge mass of contradictory statements, we think, preponderately shows that the highway was in the found condition. Furthermore, we have likewise reached the conclusion, based on that finding, that there was no negligence attending defendant's maintenance of the crossing that proximately caused the accident.

It is next charged in the petitions of plaintiffs, and stated in the brief of their counsel:

"That (on information and belief) the engineer on said train did not sound his whistle or ring his bell or give any other audible warning of the train's approach to said crossing or, if he did so, such was not done until as or after the automobile had " 'jogged' " up on and become trapped on said tracks; that the railroad tracks were perfectly straight for at least a mile south of the crossing and there was nothing to interfere with the engineer's view of said crossing and nothing to prevent or obstruct his seeing the automobile " 'jog' " up on and come to a stop on said crossing; that said automobile was plainly visible to the engineer as it approached and tried to cross said crossing and was on the crossing in the middle of the tracks and in plain view for an appreciable length of time while said train was approaching said crossing; that the car and its occupants were actually seen or should have been seen by the engineer as they approached the crossing and while actually " 'stalled' " thereon in ample time

for him to have applied the brakes to his train and brought the same under control and to a stop in time to avoid striking the car, but that nevertheless in disregard of the safety of the occupants of the car and heedless of the danger to which they were then subjected he maintained the speed of his train and made no effort to and did not apply his brakes, or otherwise attempt to bring the train to a stop until after the actual collision or, if he did so apply said brakes prior to the actual collision, it was done too late or said brakes were defective so that such application, if made, or such efforts, if any, which the engineer made to stop his train, were wholly insufficient and ineffective to avert the collision."

▪ The evidence shows, according to our appreciation of it, that when the train was about 1,320 feet, or one quarter of a mile, south of Balmoral Crossing, and proceeding toward the north at a rate of speed of approximately 40 miles per hour, the engineer, C. F. Jansen, set the motor car's automatic bell to ringing and commenced the sounding of the regular and usual crossing signal. The signal consisted of sounds from a dual horn, audible from a great distance, described as blasts of two longs, one short, and another long. These facts, seemingly, are not now disputed by plaintiffs. They do urge in this court, however, in connection with their charge of negligence in the operation of the train, that as the sounding of the crossing signal began the engineer noticed the automobile's coming to a stop on the crossing approximately one quarter of a mile away; and they advance the argument that it was gross negligence for the engineer to fail to apply the brakes and to stop the train before the collision, after the car was seen stalled on the track, as could have been done in the stated distance. In other words, the contention is that the engineer had the last clear chance to avoid the accident; that he was negligent in failing to do so, and that his negligence was the sole proximate cause of the deaths.

Our careful study of the record has failed to disclose any direct and positive evidence showing that the engineer witnessed the motorists in their claimed predicament when a great distance from them. The only proof of any kind tending to support plaintiffs' contention, and on this they largely rely, is a statement, testified to by a Mr. D. L. Hammett who was a passenger on the train, that was assertedly made by the engineer. This witness said that the engineer, a few minutes after the accident and while discussing with others the details of the occurrence, remarked that:

"Just as he caught hold of the cord to blow the whistle that the car hopped up on the track and stopped and that he thought that they would get off but they didn't and further stated that he was, I wouldn't be positive of the age he said he was, but he had hoped that he would make it through without anything like this happening but he hadn't."

Mr. Jansen, who had been a locomotive engineer for 40 years and had never previously experienced a crossing collision, denied emphatically that he made the statement attributed to him by Hammett, although he admitted conversing briefly with several persons about the accident shortly after it happened. Said he:

"I did not make such a statement because we met on the crossing; he got to the crossing about the same time I did; I did not see him stop; last time I saw him he was moving toward the track and I done everything that could be done at that time —only waiting for the crash; we met right on the crossing, whether he got over the rail or not I don't know but he was moving up to the crossing like as if he killed his motor or trying to stop. Slowing down, that's all I remember."

\* \* \* \* \* \*

"I told them that was my first accident and I regretted it very much and that he run up there and got struck before I seen him stop."

The version offered by engineer Jansen, the only eye witness to the disastrous event, is that while he was in the act of giving the last long blast of the crossing signal the automobile came into view just west of the stop sign. Realizing that the car would not stop for the crossing, he changed that long blast into a succession of short ones, and immediately applied the emergency brakes. When the motorists were first observed, he was passing the second pole south of the crossing, this being 224 feet away; and the application of the brakes was made about 200 feet from the point of collision. The train, which was 160 feet in length, was brought to a stop with its rear end 132 feet north of the crossing. Based on the engineer's expressed views, it travelled 516 feet from the time the automobile was first seen; and according to the testimony of a breaking expert, the stop was efficiently effected.

The prompt braking of the train was due to the fact, stated the engineer, that it possessed equipment known as a dead man's control. This emergency air brake mechanism includes a pedal which the engineer's right foot operates. While the train is running, a full and continuous depressing of the pedal is necessary. Any slight lessening of the pressure of the foot thereon causes the opening of an attending valve and the complete engaging of the brakes; and nothing thereafter can be done to prevent a quick stopping of the train. The described type of brake is used where only one person is employed in the motor car's operation, as in the instant case; and the term dead man's control is derived from the fact that when the operator dies while on duty, or then otherwise becomes seriously incapacitated, a quick stop results on his foot's releasing of the pedal.

■ It is to be seen from the foregoing that the account of the accident provided by the statement which Hammett attributes to the engineer differs materially and widely from that given by the engineer himself in his positive testimony. If, as the attributed statement indicates, the automobile was stalled on the track to the knowledge of the engineer when he "caught hold of the cord to blow the whistle," or when a distance of a quarter of a mile intervened, undoubtedly the train could and should have been brought to a stop before the crossing was reached; but we can not accept that as being the correct factual situation. There appears no good reason for our disregarding the testimony of the sole eye witness, engineer Jansen, as plaintiffs request us to do. We do not find it to be "replete with demonstrable errors." It is true that he was an employee of defendant, that he piloted the train that crashed into the automobile, and that several slight inaccuracies appear in his testimony; yet he testified at length in a straightforward, emphatic and unevasive manner, and his testimony in many instances and particulars is amply corroborated.

It is not our belief that Hammett purposely misquoted the remarks that Jansen made shortly after the accident occurred. Rather, we think that he misunderstood them and was mistaken as to their true import. Furthermore, we think that this witness was mistaken as to the time that the braking equipment of the train began functioning. He testified that there was no application of the brakes or slowing of the train until after the striking of the automobile. The several members of the train crew, and also the mail and express clerks who were occupants of the motor car and were not defendant's employees, furnished testimony corroborating that of Jansen to the effect that the emergency brakes became engaged a short time before the crash occurred.

Tending to support the statement of Jansen that the automobile was not in the middle of the tracks, a position which the petitions of plaintiffs assert, are certain physical facts disclosed by the record. It is shown that the left front portion of the motor car struck the right front portion of the automobile, and that the impact drove the latter machine several feet west of the track and north of the highway.

In opposition to the contention that the train was incautiously driven into a disabled automobile, is the following interesting testimony of Engineer Jansen:

"When a car gets on a crossing that means danger to me, to the passengers back there and it may ditch me, the train, when such a thing as a car gets on the crossing they are dangerous; it doesn't look reasonable that I should sit up there and run toward that car on the crossing; we don't like to kill or hurt anybody and I am in a dangerous position sitting in front of this glass only two feet from the front window; running against a car on the crossing you have an idea of what would happen."

■■ The record, when considered in its entirety, is convincing that all of the rolling equipment was in good order, that the train was being operated in a careful and prudent manner, and that everything possible was done to avert the calamity when the engineer did discover, or in contemplation of law should have discovered, the perilous position of the motorists. Consequently, it may be said that inapplicable to the instant cases are the last clear chance and discovered peril doctrines, as announced in Rottman v. Beverly, 183 La. 947, 165 So. 153, Jackson v. Cook, 189 La. 860, 181 So. 195, and numerous other cases in the Louisiana jurisprudence; and that there was no proven negligence on the part of defendant, or its employees, which proximately caused the accident.

■ It is argued by counsel for plaintiffs that the doctrine of res ipsa loquitur is here appropriate. We are unable to agree with this contention. The mere occurrence of an accident, with attendant injuries, to a person while on railroad

tracks does not create the presumption ·of negligence on the part of the railroad company. "The negligence of the company must be proved with certainty, and it must be shown that such negligence was the proximate cause of the accident." Nolan v. Illinois Central Railroad Company, 145 La. 483, 82 So. 590, 593. See, also, 52 Corpus Juris, Railroads, § 1975.

The conclusions that we have reached, and above stated, make unnecessary a consideration of the alternative plea of contributory negligence on the part of decedents which defendant urges.

The judgments, in our opinion, are correct; and they are affirmed.