## ALLEN v. TEXAS & PACIFIC RY. CO.

### Civ. A. No. 2873.

United States District Court
W. D. Louisiana, Opelousas Division.

March 5, 1951.

Seth Lewis, Opelousas, La., Leon S. Haas, Jr., Opelousas, La., for plaintiff.

Frank H. Peterman, Alexandria, La., for defendant.

PORTERIE, District Judge.

When we overruled the motion for a directed verdict, at the close of the whole case, we felt then that the motion would likely have to be sustained later. However, as indicated by Rule 50(b) of the Federal Rules of Civil Procedure for the United States District Courts, 28 U.S.C.A., we thought the verdict of the jury should be sought to prevent the repetition of a whole new trial, in case we were wrong.

### Motion for directed verdict at close of case (Judgment notwithstanding verdict)

In passing on this motion, the evidence must be considered in its aspect most favorable to the plaintiff, with every fair and reasonable inference which the evidence justifies. Mandro v. Vibbert, 4 Cir., 170 F.2d 540.

This action is one in tort, under Art. 2315 of the Revised Civil Code of Louisiana. Therefore, the laws of Louisiana apply. Erie R. Co. v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

If, by the clear preponderance, the evidence shows that the plaintiff was guilty of contributory negligence, furnishing the proximate cause of his injury, he is barred from recovering any damages, regardless of the negligence of the defendant.

In Tucker v. Illinois Cent. R. Co., 141 La. 1096, 76 So. 212, 213, the Louisiana Supreme Court said:

"And, as has been held by this court and others:

" 'No failure on the part of the railroad company to do its duty will ex- cuse any one from using the senses of sight and hearing, upon approaching a railway crossing, and whenever the due use of either sense would have enabled the injured person to escape the danger, the injury is conclusive evidence of negligence, without any reference to the railroad's failure to perform its duty.' "

See, also, Lehon v. New Orleans Public Service, 10 La.App. 715, 123 So. 172; Mese v. Summers, La.App., 170 So. 510; Daricek v. Forrest, La.App., 173 So. 601.

Headnote 3 of the syllabus by the Court in Borell v. Cumberland Telegraph & Telephone Co., 133 La. 630, 63 So. 247, L.R.A. 1916D, 1064, recites:

"Whether a person's own negligence is the sole, proximate cause of an injury that he receives or is a cause contributing directly thereto, the result is the same. He has no action for the recovery of damages in either case."

Plaintiff, Allen, admitted that he knew he was approaching a railroad track and for that reason he reduced his speed to 15 miles per hour. He stated further that, when he made this reduction in the speed of his automobile, he was 30 or 35 feet from the railroad track. He looked to the right but admitted that his view of the track north of Landry Street was obstructed by a building and for that reason he could not see a train approaching from that direction. He then looked to the left where the view was clear, but without stopping or making any other effort to see the track on the north side of the street, he continued on his way and suddenly saw the rear part of the locomotive about 10 feet in front of him. His car hit the locomotive underneath the front of the cab of the engine at a point about the middle of the street. He estimated the speed of the train at 6 miles per hour.

As he approached the Texas & Pacific crossing he says he was going between 20 and 25 miles an hour. We quote from his testimony:

"When I approached their crossing I was about 35 or 40 feet from the crossing and I slowed down. * * * I slowed down to I imagine under twenty—about 15 miles an hour. * * * I didn't hear

any bell. I didn't see any flagman. I looked to the right and they had a building and you can't see because it is a blind crossing unless you move beside it and I didn't see any train and I looked to my left at this opening where the track runs at an angle and you can see down that far and I didn't see anything coming and when I looked up again that is when the train pulled out in front of me and I was right on the edge of the track and I applied my brakes and turned to the left and couldn't avoid hitting him."

Plaintiff said he was familiar with the track, having crossed it frequently, and that he had been living beyond it for about a month.

On cross-examination, when asked if he stopped his automobile before going on the crossing, he answered that he did not, but he slowed it down considerably. He said that he did not bring his car to a stop but reduced his speed to 15 miles an hour when he was about 30 or 35 feet from the crossing. He was asked whether, at 35 feet from the crossing, he could see the railroad track north of the sidewalk and he said, "No, sir, because of the building there". He could not see any of the track north of the crossing when he was 35 feet away and he repeated that at this distance he could see only to the corner of the building. He was asked at what distance he could stop his car going at 15 miles an hour on an upgrade and he answered it could be done in about 18 or 20 feet at the most. When he slowed down to 15 miles an hour, he was 35 feet from the crossing and at that time the building obscured his view north of the crossing so that he could not know whether there was a train back of the building or not. He was asked about continuing toward the crossing when his visibility was obscured by the store and if it were not true that he

went on ahead toward the track under these conditions without making any stop. He was asked why he did not see the train when he was 30 or 35 feet from the crossing and he said, "The only thing that prevented me from seeing it there was no engine out there". He was asked what prevented him from seeing it at that time north of the crossing, and he said it was, "Because he wasn't sticking into view and if there had been a flagman and train at the edge of the road I would have seen it". He repeated that prior to hitting the locomotive he looked to the left where the view was open and he could see down the track. He said, "It is the only clear view you get"; and that when he looked in front of him he was right at the track and, "I assumed nothing was coming and I started to accelerate my car when the engine came out from the side". He was about 10 feet from the track when he saw the engine in front of him. On re-direct examination the plaintiff said that when he saw the train it was going 6 or 7 miles an hour. On re-cross examination he was asked if it was not a fact that the front of the engine was already across the street when the collision occurred and he said, "Yes, sir, it would have been across the street".

Landry Street, at the point of the accident, is 50 feet wide from curb to curb.[1] The track crosses at a slight angle and both plaintiff's and defendant's witnesses estimated the length of the track between the curbs, one stating that it was 53 feet and the other that it was between 50 and 55 feet. On either side of the curb there are sidewalks that are practically $4\frac{1}{2}$ feet wide. There is no dispute that the collision occurred at the middle of the street; nor is there any dispute that the plaintiff's car struck the locomotive under the front of the cab of the engine.[2] The cab of the locomotive is

---

1. Correct width of Landry Street at the railroad track. Then 54 feet is the distance to use, for that is the distance the engine, at a slight angle, had to cover to cross the 50-foot street. St. Landry Street, however, 40 feet away from the nearest rail, in the direction from which Allen came, is reduced to a regular width of 37 feet. The 13-foot reduction is altogether accomplished on the south

side (Allen's left driving side of the street) and is done progressively in a distance of 40 feet. Both surveyors testified to these facts and one glance at the map will verify this.

2. The language of the four best-placed witnesses is as follows: 1. The head brakeman: "It was the rear driver that was approximately right on the cab of

28 feet back from the front of the engine. The front of the engine, according to plaintiff, was not at the sidewalk at the time he looked to the right. The cab of the engine would therefore have been at least 28 feet or more north of the sidewalk at this time. In order for the cab of the engine to reach the middle of the street, it was necessary for the engine to travel at least 28 feet plus the width of the sidewalk of 4½ feet, plus half the width of the street of 27 feet or a total of approximately 60 feet or more. Plaintiff himself swore that the train was going about 6 miles an hour. He claims he looked to the right and saw nothing and that the front of the train was not at the sidewalk at that time. He was then 30 or 35 feet from the track. The train was going, according to plaintiff, 6 miles per hour; and plaintiff was going, according to his own statement, 15 miles an hour. Nevertheless, he traveled 30 or 35 feet at 15 miles per hour to reach the point of collision, while the train traveled 60 feet or more at 6 miles an hour to reach the same point. To put it in another way, plaintiff was traveling 15 miles an hour, which is equivalent to 22 feet per second; it therefore took him about 1.5 seconds to reach the point of collision from the time he looked to the right. The train was traveling, according to plaintiff, 6 miles per hour, which is 8.8 feet per second. In order for the cab of the engine to reach the center of the street, with the engine starting just north of Landry Street, it would have required about 7 seconds.

It is readily seen, therefore, that the accident could not have happened in the manner described by plaintiff, because it is in complete conflict with an arithmetical computation, which cannot be disputed. Allen just could not have looked at the time and place he said he did; and the train just could not have been out of his view if he had looked at that time and place. To hold otherwise, we must decide that 1.5 seconds is the same as 7 seconds; that an automobile going 15 miles an hour will take the same time to cover a distance of 30 feet that a train going 6 miles an hour will take to cover a distance of 60 feet.

■ Let us consider the Tatman Grocery, located near the track, north of the sidewalk. This is the building that plaintiff claims obstructed his view to the right. The only plat of the locality, filed in evidence, was the one prepared by the defendant. The City Engineer for Opelousas, Louisiana, where the accident occurred, who testified for plaintiff, was shown this plat and he admitted that it was substantially correct and that the Tatman Store was 38 feet from the center of the railroad track. The railroad track, north of Landry Street, is visible for a considerable distance to the driver of a car 35 feet from the first rail. It is clearly visible at 30 feet, because you are then closer to the track than the nearest corner of the store by eight (8) feet. Had Allen driven cautiously and with due regard to his own safety and according to the rules of the road, he could and would

the engine where the fireman sits"; 2. the engineer: "He struck it (the engine) about the middle—right by the cab"; 3. the fireman: "Underneath the forward part of the cab on the third driver"; 4. the plaintiff, Allen, said: "I don't know what took place. I don't know where I hit."

The evidence of the eye-witnesses, we believe, clearly preponderates to show that the automobile hit the engine "* * * under the front of the cab of the engine."

Now, when we come to the physical facts, they have two serious handicaps: 1. It is difficult—and quite unreliable—to reconstruct an accident from observations of marks on the objects that hit each other or from the relative positions of the objects after the impact. We need not mention the many involved and counteracting factors of relative speeds, relative masses, relative angles, relative shapes, etc., that enter. 2. The other handicap is that neither the automobile, nor the picture of it, has been furnished for the record; one of the two objects is missing.

Nevertheless, from the physical facts, the automobile did hit under the front of the cab, as the eye-witnesses state. The physical fact of something having hit the brake shoe head of the rear wheel and that something hit, at the same time, the middle of the back side rod is corroborative of the statements by the eye-witnesses. These two points are under the front of the cab. The rod moves horizontally.

have seen the train in plenty of time to stop his automobile. Once Allen cleared the west corner of the Tatman Grocery, there was then no obstruction to his full and complete view of the railroad track.[3] If Allen had looked to the right when he was 30 or 35 feet or even at 25 or 20 feet the track, he was bound to see the train and could not have failed to see it. As a matter of physics, it was impossible for the train, traveling at 6 miles per hour, to have come from some point north of the track, out of plaintiff's view, and yet the front of the engine be half way across the street after the plaintiff was within 30 feet of the track. The engine was already in the street when plaintiff was within 30 or 35 feet of the track. Had he looked then he would have seen it. He did not see it because he did not look. If the engine was not already in the street at this time but was north of the sidewalk, plaintiff's car, going 15 miles per hour, would have gone over the track, just 30 feet away, ahead of the engine, which was going 6 miles per hour and was not even in sight. Plaintiff never would have hit the train. Plaintiff's own version of the accident burdens him with contributory negligence, which was the proximate, in fact, the immediate cause of the accident and his resulting injuries.

According to Allen, his speed just prior to the collision was 15 miles per hour, that of the train was six. He was going two and one-half times as fast as the train. While Allen would go 100 feet, the train would move only 40 feet. Since he claims

the train was not at the north sidewalk when he was 30 or 35 feet from the track, how did the cab of the engine get to the middle of the street while he traveled the intervening distance? The very least distance the engine moved, by the undisputed evidence, was 60 feet. According to plaintiff, it was even more, because we have assumed the front of the engine was just north of the sidewalk, while he says it was not even in sight when he was 35 feet from the track. But, being conservative, let us say the engine had to move only 60 feet for the cab to reach the middle of Landry Street, then plaintiff would have gone two and one-half times as far, or 150 feet.

This arithmetical and conclusive fact stands forth clearly: When the engine came out from behind the Tatman Grocery and entered the intersection, Allen was at least 150 feet away and probably further, because he says he was driving 25 miles per hour until within 35 feet of the track. Therefore, the locomotive was occupying the street when Allen was far enough away to have seen it and stopped several times had he been looking or not driving at a highly excessive rate of speed. There is no logical way to avoid this conclusion.

The facts are that plaintiff did not stop at all before the collision and he admitted this to be true. The fact is that he did not look to his right at a time when he could have seen the train as he would have seen it had he done so. The fact is that he

3. The map in the case is according to scale; one inch equals 50 feet. Place any footrule to the map to measure the distance between the track and the front corner of Tatman's store nearest the track and you are satisfied as to the accuracy of 38 feet. So, the map is drawn to scale. If you continue to measure and take one inch from the nearest rail in the middle of the street in the direction of an oncoming car, a distance of 50 feet, then run a straight edge from that point to the corner of Tatman's store, prolonging the straight line to the railroad track, you will then locate a point on the track 100 feet from the center of the track in the middle of the street; in other words, Allen, when 50 feet from the first rail, could see to his

right up the track for 100 feet. Similarly, by the same process of measurement, when Allen was 100 feet from the track, he could see 44 feet up the railroad track. These measurements are sufficiently accurate to permit their use in this case.

The plaintiff made every effort to prevent the record from having a sketch of the situs of the accident. The angle of intersection, made by the street and the track, is sufficiently correct; it was plotted from previous azimuth maps of the engineering records of the defendant. Thousands of people see the angle every day. How could a tricky or unreliable map be offered? Plaintiff never offered a map of his own, nor did he rebut the filed map.

could not have been as close to the track as he said he was when the train started over the street, otherwise the collision could not have possibly taken place. The fact is that he did not look at a time and place where looking would have been effective, because, if he had done so, he is bound to have seen the train before it reached the street. His own admission is that he could not see to the right because of the Tatman Grocery, yet he did not look again to the right after he cleared the Tatman Grocery, nor did he stop his car after passing this obstruction or make any effort to have his car under control so that he could stop instantly. He made no pretense of looking to the north of Landry Street at a time when his looking would have been effective. Under the law, his contributory negligence bars his recovery. Matthews v. New Orleans Terminal Co., La.App., 45 So.2d 547; Hutchinson v. Texas & N. O. R. Co., La.App., 33 So.2d 139; Wyche v. Brian, La.App., 28 So.2d 143; Louisiana & Arkansas Ry. Co. v. Jackson, 5 Cir., 95 F.2d 369; Great Northern Ry. Co. v. Taulbee, 9 Cir., 92 F.2d 20; Northern Pac. Ry. Co. v. Bacon, 9 Cir., 91 F.2d 173; Illinois Cent. R. Co. v. Leichner, 5 Cir., 19 F.2d 118; Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645; Pokora v. Wabash Ry. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049.[4]

Section 3, Rule 17(a) of Louisiana Act No. 286 of 1938, LSA–RS 32:243, provides as follows:

"It shall be the duty and obligation of every person owning, driving, operating, or causing or permitting a vehicle to be so driven or operated, when approaching at grade crossing of a public street, road or highway with any steam, electric, street, interurban or other railroad or tramway, operated upon fixed rails or permanent track, to, *upon his own responsibility, bring such vehicle to a full and complete stop at such a place, in such a manner and for a sufficient period of time to enable* *the driver or operator thereof to observe the approach of trains or cars thereon,* by looking up and down said track in both directions and by listening therefor, and before proceeding thereon or thereover. In the event it is impossible so to do, then such persons shall proceed only with the greatest caution *and at their peril."* (Emphasis ours.)

See, Hutchinson v. Texas & N. O. R. Co., La.App., 33 So.2d 139; Alanza v. Texas & P. Ry. Co., La.App., 32 So.2d 341; Ashy v. Missouri Pac. R. Co., La. App., 186 So. 395; Slayter v. Texas & P. R. Co., La.App., 182 So. 343; Winfiele v. Texas & P. Ry. Co., La.App., 150 So. 43; Perry v. Louisiana & A. Ry. Co., La.App., 142 So. 736; Consolidated Companies v. Yazoo & M. V. R. Co., 155 La. 233, 99 So. 203; Young v. Louisiana Western R. Co., 153 La. 129, 95 So. 511; Andrepont v. Texas & P. R. Co., 5 La.App. 625; Burton v. Illinois C. R. R., 3 La.App. 362, 363.

It is argued that the defendant Allen was not required to come to a complete stop and that when he slowed down to 15 miles an hour and looked in both directions he did all that was required of him under the law. To begin with, this argument directly contradicts La. Act No. 286 of 1938 and the decisions cited above. Act No. 286 of 1938 says that the motorist should bring his vehicle to a full and complete stop at such a place and in such a manner and for such a period of time as would permit him to see the approaching train.

■ But, even if the motorist does not have to come to a dead stop, the motion of his vehicle should be so retarded that he can stop instantly in the open space where the train could be seen. Allen admits that he did not stop. He admits that he could not see the track to the right of Landry Street, because of the Tatman Grocery, yet he continued to drive toward the track at a speed of 15 miles an hour, without looking at all toward the direc-

---

4. This latter case modifies the Goodman case (immediately preceding) to the extent that the driver of the automobile does not have to get out of his vehicle if necessary to find out whether or not a train is dangerously near.

tion from which the train was coming after he had cleared the obstruction to his view and even accelerated his speed just before the collision at a time when the statute says he should have it under such control as to be able to stop instantly. We cannot say that the plaintiff took the precautions required of him by law. It has been held many times that the greater the difficulty of seeing or hearing a train, the greater is the caution required of the motorist.

See, Dardenne v. Texas & P. Ry. Co., 13 La.App. 262, 127 So. 458; Wyatt v. Yazoo & M. V. R. Co., 13 La.App. 632, 127 So. 479; Thompson v. Morgan, 167 La. 335, 119 So. 69.

The Court must set aside the verdict of the jury, because that verdict evidently gave no consideration whatever to the plaintiff's contributory negligence. The facts and inferences on the point permit only one conclusion to be drawn; therefore, the question is one of law.

The right of the court to question the findings of the jury, under the instant circumstances, is amply supported by the following cases: Louisiana & Arkansas Ry. Co. v. Jackson, 5 Cir., 95 F.2d 369; Great Northern Ry. Co. v. Taulbee, 9 Cir., 92 F. 2d 20; Northern Pac. Ry. Co. v. Bacon, 9 Cir., 91 F.2d 173; Illinois Cent. R. Co. v. Leichner, 5 Cir., 19 F.2d 118; and, Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L. R. 645.

In Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458, the United States Supreme Court said:

"If the intention is to claim generally that the [Seventh] Amendment deprives the federal courts of power to direct a verdict for insufficiency of evidence, the short answer is the contention has been foreclosed by repeated decisions made here consistently for nearly a century. More recently the practice has been approved explicitly in the promulgation of the Federal Rules of Civil Procedure."

The Supreme Court further stated that the objection of the petitioner was directed at the standards of proof which judges have required for submission of evidence to the jury. In connection with this argument, the Supreme Court said:

"Whatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked."

In Southern Ry. Co. v. Walters, 284 U.S. 190, 52 S.Ct. 58, 59, 76 L.Ed. 239, the United States Supreme Court, in reversing the District Court and the United States Court of Appeals for the Eighth Circuit, 47 F.2d 3, where a child was struck by a train, said, in part:

"Such direct testimony as there is on his behalf indicates a collision between him and the side of the train after the front part of it, which in this case was the rear end of the tender, had passed him; and all of the evidence both for plaintiff and for defendant is consistent with this view of what happened. It is clear that on this ground also a binding direction in favor of the defendant should have been given."

While it may be true that a jury may ignore the preponderance of evidence in federal courts, nevertheless its verdict must stand upon substantial grounds and not upon whim, caprice, illogical, and unsound reasoning or conclusions, that are in conflict with undisputed facts.

In the recent case of Eckenrode v. Pennsylvania R. Co., 335 U.S. 329, 69 S.Ct. 91, 92, 93 L.Ed. 41, the United States Supreme Court granted certiorari; but, after reviewing the record, affirmed the judgment of the courts below, saying, in part:

"Upon consideration of the record, the Court is of the opinion that there is no evidence, nor any inference which reasonably may be drawn from the evidence, when viewed in a light most favorable to the petitioner, which can sustain a recovery for her."

Alternative prayer for a new trial

Under the provisions of Rule 50(b) of the Federal Rules of Civil Procedure and the interpretations thereof found in the

cases of Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147; and, Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498, we should now proceed, in order to dispatch the case on appeal, with the alternative plea for a new trial, though it be inconsistent with our ruling sustaining the motion for a directed verdict.

Here we are no more to make every reasonable inference and deduction from the facts in favor of the plaintiff.

■ Is the jury's verdict supported in any manner or degree by the weight or the preponderance of the evidence? Decidedly not; first, because all of our findings of fact and reasonings made under the motion for a directed verdict, when the contributory negligence of the plaintiff barred him from recovery, are applicable again; and, if we felt a directed verdict was then warranted, a fortiori, under the less strict rule of interpretation of all the facts in reaching a verdict now to be applied, the new trial should be and must be granted.

Moreover, there are other reasons to support a new trial than were included in the motion for a directed verdict. We shall not reiterate the facts and reasons already given, but will consider them now made a part of our disposition of the motion for a new trial.

Preponderance of evidence

We believe the following false impressions were created in the minds of the jury:

(a) The plaintiff swore on the stand that he saw no light on the engine, but in Article 14 of his complaint, Section (C) (read to the jury), he alleges that there was a light on the engine but that the candle power depended entirely on the speed at which it was being driven and that at the time of the accident the candle power was below the minimum required by the laws of Louisiana. There was not a word of evidence to support this allegation, but, on the contrary, all of the testimony showed that the light was operated by a separate dynamo.

(b) In Article 5 of the complaint (read to the jury), plaintiff alleges that just prior to the accident (3:30 A. M., January 6, 1949), he had been to the Missouri-Pacific depot for the purpose of sending recruits to New Orleans, Louisiana. The records of the Navy Department would have shown that there were no recruits sent by him to New Orleans on January 6, 1949. Allen's testimony from the witness stand was different from this item of his pleadings; but he did not amend his petition when he was amending it in other respects on the day of the trial.

(c) Counsel vehemently stated that he was going to show to the jury that the sketch of the crossing made by defendant's witnesses was false, yet he never produced the City Engineer to contradict any of the measurements or the layout in general. We believe this method of inquiry left the impression with the jury that the defendant's witness was not telling the truth.

(d) Counsel for plaintiff declared that he was going to show that Conductor Brown, who said it took 2 or 3 seconds for the air brakes to take effect, did not know what he was talking about and that he was going to produce railroad men to show that this statement was false. He never produced any such witnesses, although given a recess in which to get them.

(e) Allen testified concerning his activities before the accident and his account does not agree with that of Tatman, his friend and companion. He said he took his wife home between 1:00 and 1:30 and told her he was going to Eunice to pick up a boy and bring him back and put him on the train. When Tatman was on the stand, he said that Allen told him, at 2:30, when he came back to the Club, that he was going to pick up some boys in Opelousas and put them on the train. Plaintiff changed his position at the trial, as he did not say he had actually put some boys on the train for New Orleans. We judge a record of this would be found, if true. He said on the witness stand that he was looking for a boy, whose name he was unable to remember, and who failed to show up. His account was contrary to what he al-

leged in his complaint and contrary to what he told Tatman. It is true that he claims that a mistake was made by his attorney in drafting the complaint; but the attorney had evidently gone over the complaint with him before the trial, because they came in Court on the morning of the trial and amended the petition to make certain changes. Nothing was changed then about picking up some recruits and putting them on the train. After Tatman made the statement, on the witness stand, that Allen told him, at 2:30, that Allen was going to put some Opelousas boys on the train, Allen followed Tatman, on the witness stand, with testimony different from his complaint and different, also, from Tatman's account.

(f) Allen claims he left his home that night between 1:00 and 1:30 and got to Eunice at about 1:45. He was back at the St. Landry Club at 2:30. The distance to Eunice was 20 miles. He therefore drove 40 miles at night, circled the square in Eunice, and drove back to Opelousas, all of which did not consume more than an hour. He could not remember the name of the boy he was to meet in Eunice. There was a record of it, but he did not produce that record. He claimed to have obtained a subpoena from the Court for the Navy to produce the records showing the name of this boy; but, on cross examination, he admitted that he had not filed any application with the Court on this subject.

■ A summary of defendant's evidence shows that there was no negligence on the part of the Railway Company.[5] The question of the sign at the crossing is immaterial, as this is intended to warn the mo-

---

5. Huddleston testified that before the collision the pilot of the engine was about 4 or 5 feet north of the sidewalk when it came to a complete stop. He walked to the center of the street and looked both ways and gave the engineer the come ahead signal, because there was no traffic approaching from either direction at that time. After the engineer had been given the signal, Huddleston saw an automobile come over the Southern Pacific track, which is admittedly 1242 feet east of the place the collision occurred. He stepped out of the center of the track and took a couple of steps toward the engine and got on the pilot. He showed where the rod is on the front of the pilot beam, which he held. By leaning forward, he was able to see toward the Southern Pacific crossing, and when he saw the plaintiff's automobile getting close he started flagging. He said the engine's headlight was burning at the time the engine stopped at the Landry Street crossing and was burning at the time the engine started across the street and was burning at the time of the accident. On cross examination, he explained that, when he got on the cow catcher, the automobile was a considerable distance away and under such conditions you normally think that a man is going to stop. He also testified to the other stops that had been made in Opelousas and the fact that the bell was ringing continuously.

Mr. Pizollata, the fireman who was riding on the engine, says that, before the collision, it stopped at the Landry Street crossing. The front end of the locomotive was then just about north of the sidewalk. He said that the engineer blew two blasts of the whistle after he received a come-ahead signal from Brakeman Huddleston. He says the headlight of the engine was burning at the time and that the bell was ringing, and that it had been ringing constantly from the time they got to Opelousas. When the engine first started, the witness could not see down Landry Street because of the building known as Tatman's grocery. When he came out from behind the building, he looked to his left and at this time the cab of his engine was about at the sidewalk. He saw an automobile approaching and it seemed to be about two blocks or 400 feet away, but he did not know what the speed of the car was. The headlights on the automobile were burning and the vehicle was moving toward him and it was hard to estimate the speed. He did not have any reason to believe that the automobile was going to run into the locomotive. The engine headlight was burning at the time; the bell was ringing; there were other lights on the engine; and, for these reasons, he assumed that the driver of the automobile would stop. When the automobile was about 50 or 60 feet away, he realized that it might not stop; so he yelled to the engineer. About this time, the brakes on the automobile screeched and it came on and hit the train. This witness said that the engine moved about 15 or 20 feet after the collision. He further testified

torist that he is approaching a railroad track,[6] and since Allen admitted that he knew he was getting near the Landry Street crossing, this feature of the case needs no consideration. The train stopped 3 or 4 feet north of the sidewalk. This was testified to by Engineer Capello, Fireman Pizollota, Brakeman Huddleston, Brakeman Love, Brakeman Colligan and Conductor Brown. There is no contradiction of this evidence other than plaintiff's statement that he did not see the train at the crossing; but he did not see the train at all until the cab of the engine was nearly half way across the street. The bell was ringing and had been put on with the automatic ringer when the train · entered Opelousas. This was testified to by all six witnesses mentioned above and there is no contradiction

of it except the negative statement of the plaintiff that he did not hear the bell. The headlight was burning and this fact is likewise sworn to by all six of the defendant's witnesses and is admitted in plaintiff's bill of complaint, where he acknowledged that the headlight was burning. It would be strange indeed if a train crew would operate at night in utter darkness, not only in violation of the rules of the Interstate Commerce Commission, which require a headlight, but also contrary to all rules for their own safety. There were only minor discrepancies in their testimony. The essential facts contained in the evidence of the railroad employees are not contradicted.[7]

■ It has been held many times that the positive testimony of the train crew

that people frequently drive up to railroad crossings and stop close to the track and he said, "Ordinarily that is what they do, drive right up to the track and stop". And that this happens very often. On cross examination, he was asked where the front part of the train was when he first saw the automobile. He answered that it was a boiler length ahead of him. Of course, this was exactly the physical situation, because he was in the cab and the boiler extended out in front of him to the front of the engine. He said that the cab of the engine was over the sidewalk, which would put the front of the engine 28 feet out in the street at the time he first saw Allen's car. He said that the cab of the engine was about at the middle of the street at the time of the collision. He said that the cab traveled from the middle of the street, where the collision took place, to the south sidewalk, after the brakes had been applied.

6. We quote our own words, in 1943, in the case of Williams v. Thompson, D.C., 48 F.Supp. 760, 763, as being legally explicatory of the instant situation:

"4. The Court is not unmindful of the fact that the greater part of the testimony in this record had to do with the fact that the stop-law sign, required by Louisiana Act No. 12 of 1924, 5 Dart's Statutes § 8137 [LSA–RS 45:562], was not placed according to the specifications of that statute, in that it was on the north side instead of the south, the left side of the street instead of the right approaching from the west, was less than fifty feet from the nearest rail, and was

not precisely at right angles to the street.

"Defendant established the physical impossibility of literal compliance with the statutory specifications because of the location of the street pavements and buildings, and proved the actual location of the sign as the most efficient and practical under existing conditions.

"If it be assumed, pro arguendo, as a matter of law, that the railroad is charged with negligence in the placement of the sign other than according to statutory requirement, such neglect constitutes but ordinary negligence, since, at most, the statute was not ignored and there was attempted good-faith compliance. Such ordinary negligence, under the law, does not preclude the effectiveness of the bar of contributory negligence. In fact, as a legal concept, some such fault on the part of defendant is an essential prerequisite thereto, for, otherwise, decedent's carelessness would not be contributory negligence at all, but the sole proximate cause, as urged by the defendant."

7. The plaintiff used three of the train's crew as witnesses under cross-examination; the counsel for defendant did not question them at all at that time. Naturally, this first interrogation was not complete. The defendant, when using these three witnesses in its behalf later, conducted an examination covering all · they knew. It is not a fair point to say that these three witnesses falsified because their second examination brought out facts not brought out by them when they were first on the stand.

outweighs the negative testimony of outsiders, unless their evidence is impeached or is in conflict with physical facts. Bordenave v. Texas & New Orleans R. Co., La.App., 46 So.2d 525; Begue v. Louisiana & Arkansas Ry. Co., La.App., 42 So.2d 97; Hutchinson v. Texas & N. O. R. Co., La. App., 33 So.2d 139; Barnes v. Texas & New Orleans R. Co., La.App., 16 So.2d 600; McClain v. Missouri Pac. R. Co., La. App., 200 So. 57; Henderson v. Missouri Pac. R. Co., 15 La.App. 196, 131 So. 586.

Furthermore, the evidence given by the train crew conforms to reason. It will be remembered that the train stopped about 4 or 5 feet north of the sidewalk and that the cab of the engine was 28 feet from the front of the train or 32 feet from the sidewalk. Adding the width of the sidewalk (which was 4½ feet) to half the width of the street (which was about 27 feet), the train moved from the time the engineer got the signal to come ahead, a distance of 64 feet until the time of the collision. At 3 miles an hour the estimated speed of the train would be about 4½ feet per second and 14 seconds therefore elapsed from the time the train started until it was hit by plaintiff's automobile. Allowing two seconds for the engineer to have released the brakes so the train could move forward,

there would be approximately 16 seconds between the time Huddleston gave the come ahead signal and the time of the collision. At 50 miles an hour, which is about 73 feet per second, the plaintiff would have driven nearly 1200 feet. At 60 miles an hour, he would have driven a little over 1300 feet. So it is correct to say that, while the train traveled 60 to 65 feet, the automobile could have traveled over 1200 feet; that is, from the Southern Pacific crossing to the Texas & Pacific crossing.

The same estimate of time and distance given by defendant's witnesses accords with arithmetical calculations when we come to consider the situation that existed when the fireman first saw the automobile. His cab was then over the sidewalk, or about 32 feet from the point of collision. At 3 miles an hour (or 4½ feet per second), it took the cab of the engine between 6 and 7 seconds to reach the middle of the street. During this time, plaintiff's automobile, at 50 miles per hour, or 73 feet per second, could well travel the 400 feet which was the distance estimated by the fireman that the automobile was from the track when he saw it. In other words, plaintiff's evidence conflicts with the physical facts; defendant's evidence conforms to the physical facts.[8]

8. There are two striking conflicts in the evidence:

(a) Tatman, plaintiff's friend and companion, who was with plaintiff Allen all about the night places and who was in his car following Allen's car to the railroad track accident, and who with Zeb Love, brakeman, took Allen to the hospital, says that he did not tell Zeb Love, when the two were returning to the scene of the accident after having placed Allen at the Hospital, that Mr. Allen had been in bar rooms, had had several drinks, and that he (Tatman) was following Allen to make sure that he got home safely.

(b) Brown, the conductor, said that, when he was stepping off the distance of the skid marks, he called them to the attention of Policeman Guidroz, who had come to the scene. Policeman Guidroz was not put on by the plaintiff to prove any fact in connection with the accident; but was summoned before the trial, so as to be ready to rebut the evidence given by Brown. It could be inferred that Guidroz knew that he had talked with

Brown about the skid marks. What is the other explanation for his being summoned, since he was not used as a witness to prove anything? Apparently, the reason for his being summoned was to rebut a fact which had not yet been proved. Had he been summoned after the conclusion of defendant's evidence, for rebuttal purposes, this would be argument to support the genuineness of his testimony. He comes to Court, as a witness, in advance of the trial to rebut a statement that has not yet been made.

Zeb Love saw the skid marks from the Allen car. Pizollota, the fireman, said, "I heard the brakes screech."

We feel that the weight of the evidence, in both of these phases, is not with the plaintiff.

This conclusion is made in the manner and from the source as described in the following language of the case of Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 755, 91 L.Ed. 849:

532

The only charge of negligence which plaintiff can argue with any degree of reason is that Huddleston, after giving the engineer the signal to come ahead when there was no automobile in sight, should then have given him a signal to stop after he saw Allen's automobile 1242 feet away. The operators of a train have a right to assume that a person approaching a track will stop. Bordenave v. Texas & New Orleans R. Co., La.App., 46 So.2d 525; Levy v. New Orleans & Northeastern R. Co., La.App., 20 So.2d 559; Wright v. Texas & N. O. R. Co., La.App., 19 So.2d 894; Eggleston v. Louisiana & A. Ry. Co., La.App., 192 So. 774; Smith v. Texas & Pac. Ry. Co., La.App., 189 So. 316. As already pointed out, Huddleston testified that Allen's automobile was at the Southern Pacific crossing when he first noticed it and that this was after he had given the engineer the signal to come ahead.

We quote the following from the case of Pollard v. Davis, 5 Cir., 93 F.2d 193, 195:

" 'After the train has reached the crossing, the duty of the gatekeeper or flagman ends as to that train, and such person is not negligent in then leaving the position of duty since the train itself it then sufficient warning.' 52 Corpus Juris, 205; Southern Ry. Co. v. Lambert, 230 Ala. 162, 160 So. 262; Mabray v. Union Pacific R. Co. (D. C.) 5 F.Supp. 397; Phillips v. Davis, 3 Cir., 3 F.2d 798, 40 A.L.R. 1241; Baltimore & O. Ry. Co. v. Shaw, 3 Cir., 35 F.2d 410; Morley v. Cleveland [C. C. & St. L.] R. Co., 100 Ind.App. 515, 194 N.E. 806."

Further and additionally, under the language of the alternative motion for a new trial, we should inquire as to whether or not the award of the jury was excessive. On this point, we should frankly state that, immediately upon the report of the jury awarding $45,000, we thought the amount to be decidedly excessive.

The evidence shows that the plaintiff suffered serious injuries and had been in various government hospitals for many months. But the evidence also shows that the plaintiff incurred no hospital or medical expenses whatever; that he continued to draw his salary and at the time of the trial he had received a raise in pay over the amount which he was getting when he was hurt. He was in "very good" physical condition, according to his own physician, and the only injury he had which was of a permanent nature was a slight restriction in the turning of his hand at a certain angle. This was held to be permanent, but amount to little disability, if any, from a practical standpoint.

The other injury, evident at the time of the trial, was a certain lack of flexibility in one of his knees. All of the doctors, both for plaintiff and defendant, testified that this was by no means permanent and that it should correct itself in time with the exercise and use of the right leg, which had previously been in a cast for months. Plaintiff's limp was not caused by the broken bones in his leg, but was caused by this condition of his knee joint, which would probably disappear. As to the shortness of one leg, the defendant's physicians testified that this was not uncommon and that many people had this condition who were normally well and did not know anything about it. Physicians of both sides said that the difference in length of an inch or less between the two legs is taken care of by the tilting of the pelvis. As to the bone of the injured leg, the defendant's physicians testified that the broken leg was just as strong or maybe stronger than the other and that there was no weakness in the broken leg resulting from the injury. The physician for the plaintiff said a blow to that particular spot might tend more to a break than it would to the other leg, because, " * * * the muscles are weaker" in the injured leg. (The two foregoing paragraphs are specifically referred to later).

The award of $45,000 by the jury is obviously excessive.

For the reasons given above, under our consideration of the motion for a new trial,

"Determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart."

including the finding of an obviously excessive verdict, we allow the motion for a new trial.

Now, in case that, first, the appellate court should overrule our sustaining the motion for a directed verdict; then, second, should overrule our sustaining the motion for a new trial, as such, we shall now discuss, at length, by how much the award, in our opinion, is excessive. This will permit the appellate court to dispatch the case in the instance that it should determine that all of the reasons we have found for granting a new trial are incorrect and improper, except the one reason that the verdict is decidedly excessive. The appellate court might decide that a new trial should be ordered, except that the plaintiff file a remittitur within a stated period.

In what amount would this Court require a remittitur to be filed by the plaintiff?

The trial was had nearly two years after the accident; so the appraisal is practically of a settled physical status.

Injured on January 6, 1949, Allen remained at the St. Landry Clinic, at Opelousas, Louisiana, place of accident, for two days, when, after having recovered from shock, he was flown to the United States Naval Hospital at Pensacola, Florida.

He had a simple fracture of the right femur, a simple fracture of the left radius and a lacerated scalp. The x-ray showed overriding of middle and upper ⅓ simple fracture of right femur for some 2 inches. The left radius fracture was in good alignment and position. The scalp wounds were uninfected.

On August 15, 1949, Allen was transferred to the United States Naval Hospital, at Long Beach, California, at his own request, for further treatment and disposition. The summary of what happened at Pensacola is quoted from the official report:

"After 3 weeks satisfactory alignment was obtained but could not be maintained and on 9 February, 1949 an open reduction was performed with fixation with witallium plate and patient placed in bilateral hip spica. No callous was seen at the time of operation. On 6 May there was still very minimal callous formation and 10 degree anterior angulation of the fragment. Since that time there has been no change in alignment and little or no further healing. It is probable that a bone graft will be necessary."

The femur seemed to be giving trouble; the rest was progressing satisfactorily.

Allen entered the hospital at Long Beach on August 24, 1949. He stayed there for about 4 months and 15 days. The run of recorded official notations at this hospital are as follows:

"8/26/49 AP and lateral shows fracture site with considerable anterior bowing. Fracture line still apparent. Will keep present cast upon patient as it is intact.

"9/27/49 In walking spica (single hip). Complains of pain at site of fracture unless two crutches are used. Will continue present immobilization for an additional 4 weeks.

"Report of x-ray examination 8/25/49: Examination of the right femoral shaft through overlying plaster cast shows a fracture through its middle third with a long Lane plate approximated to the femur and straddling the fracture gap and held in position by six metallic screws whose tips project through the opposite cortex. The femur shows a moderate bowing deformity convexity anteriorly."

Allen describes the causes for claiming compensation for his suffering as follows:

"[W]hen I became oriented and knew what was going on I was in Pensacola and they put a tape down my leg and what they call a buck traction and tried to pull it back in place and the tape slipped overnight and tore the skin loose on my leg and the next day they put a pin through my leg and they had thirty pounds of weight hanging at the end trying to pull the bone and after about a month they operated on me and placed me in a cast from under my arms and down both legs.

"Q. You were in this traction how long? A. About a month. I was operated on and put in a cast the same day * * * I stayed in that cast approximately eight months * * * then they took that cast off and they had a cast from my chest

534

down one leg. I continued wearing that cast until 1950.

"Q. These two casts you mentioned, did they completely encase your torso? A. They are called a rib and chest cast. They come clear up to your arm pits * * * I believe it was January 1950 they cut the cast off of me and gave me a brace, steel brace, which hooks around your hips and buckles in the heel of the shoe and I wore that two months and after that they took that off and started giving me physiotherapy trying to bend my knee and they gave me treatment for six months trying to force my knee back and then they couldn't go any further and I went to several orthopedic Boards and they said that was far enough, any further or passive or active motion might further restrict my knee.

"Q. How long were you kept in this steel brace you speak of? A. I wore that a little over two months, between two and three months.

"Q. Will you give us some idea as to what treatment was administered to your arm? A. When they fixed my arm, they took the cast off and they thought they had it lined up in good condition and the cast stayed about six weeks and during this time they tried to fix my leg and they left my arm go and when they x-rayed my arm they found the bone was mis-aligned and deformed there and they had to call a consultation about operating and putting a steel plate in my arm. They advised against that because of the bone and blood disease sometimes caused by operation."

And, here, should be restated the two previous paragraphs, appearing just before we conclude to grant a new trial, wherein is stated in part by Allen's very first physician, who examined him a short time before the trial, that Allen is in a very good physical condition, etc., followed by a summary of his present physical shortcomings. These are all on the mend.

Allen, very fortunately, we feel convinced, will not ever have to leave the Navy because of his injuries from this accident.[9]

Now to itemize:

1. General and acute suffering, from date of accident to the end of the suffering, approximately twelve months (In hospital: Opelousas, 2 days; Pensacola, 7 months and 10 days; Long Beach, 4 months and 15 days) .............. $12,000

2. Loss of about $100 per month in pay for about 2 years.... 2,400

3. *Possible* reduction of future earnings because of slight partial disability........... 5,000

4. Mortification and inconvenience because of slight limp. (This may disappear through improvement and by use of knee; in which case Allen is ahead $2,500....... 2,500

5. Trivial disfigurement, because of minute remnants of scars at face and head (still improving, but one small one to remain) .................- 500

Total ...............-.... $22,400.

We are making the above awards at their maximum; the amounts could be less and still be fair and correct; any amount higher, in our opinion, would be by that much excessive.

Also, in assessing the amounts, we have allowed for the present low purchasing power of the dollar; this is the Louisiana rule.

 Therefore, in the contingency above outlined, the remittitur should be in the sum of twenty-two thousand six hundred ($22,600.00) dollars.

9. Allen testified that he was "on duty" at the time of the accident. If he should be medically discharged from the Navy as a result of the injuries received: "The compensation system, which normally re-quires no litigation, is not negligible or niggardly * * *." Feres v. United States, 340 U.S. 135, 145, 71 S.Ct. 153, 159, 95 L.Ed. ——.

Now, we revert to the first ruling made by us in the opinion and declare that we will sign a judgment setting aside totally the verdict of the jury, and dismissing the claim of the plaintiff, with costs.