**HONIG v. B. F. GOODRICH CO.**
**Civ. A. No. 121.**

District Court, D. Rhode Island.
Aug. 11, 1943.

Matthew W. Goring and Nathaniel Frucht, both of Providence, R.I., for plaintiff.

Edward Winsor and Ronald B. Smith (of Edwards & Angell), both of Providence, R.I., and John Vaughan Groner (of Fish, Richardson & Neave), of New York City, for defendant.

HARTIGAN, District Judge.

On January 8, 1943, a jury returned a verdict for the plaintiff in the sum of $15,700.00 and judgment was entered thereon.

■ The matter is now before the court on the defendant's alternative motions to set aside the verdict and the judgment entered thereon and for the entry of a directed verdict and judgment and for a new trial, filed on January 15, 1943, as permitted by Federal Rules of Civil Procedure, rule 50(b), 28 U.S.C.A. following section 723c.

Rule 50(b) provides: "Reservation of decision on motion. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

In the instant case the defendant made its motion for a directed verdict at the close of the plaintiff's case. It was denied and the defendant offered evidence in its behalf. The defendant did not make a motion for a directed verdict "at the close of all the evidence."

In view of the conclusion which I have reached that the defendant's motion for a new trial should be granted, I, therefore, deny the defendant's motion for a directed verdict.

The defendant's motion for a new trial avers that the verdict for the plaintiff is against the law; is against the law and the evidence; is against the evidence and the weight thereof; does not do substantial justice between the parties; is excessive and is contrary to the instructions of the court to the jury.

■ This suit is based on a contract which provides that the defendant will pay to the plaintiff a royalty "for all balls sold by Goodrich * * * and embodying or made in accordance with any invention of United States Letters Patent then issued and owned by licensor * * *."

(Compl. Ex. A, par. 2) The only patent involved is Honig patent No. 2,138,452, which relates to a method of winding rubber filamentary material upon a core to make a golf ball center. The claims are directed to a method of winding, embodying, as one step, heating the filament and subsequently cooling it on the core. Defendant's operation is performed on a machine and according to a method developed by defendant more than twelve years before the Honig patent was applied for.

The Honig patent specifications p. 4, c. 1, lines 30 to 43, inclusive, read as follows: "Means may be provided for heat-shrinking the filament on the core to obtain greater tension therein when this is desired and the filament is of such a nature as to be capable of responding to such treatment. The means herein shown comprises an electric hot plate 54 located as near as convenient to the core being wound and in a position where the filament will pass over or near the heating surface. Any suitable temperature may thus be produced in the filament just prior to its winding on the core and as the hot filament is wound tightly on the core and is then permitted to cool on the core, an additional tension is set up due to shrinkage on cooling."

The record fails to disclose any substantial evidence that the defendant's operation embodies any external heating means:

Honig testified (Tr. p. 118):

"408 C.Q. Let me ask you one other question about the Goodrich operation. Do you contend that the Goodrich operation entails the use of external heat, such as the hot plate, as one step in its method? A. Well, I wouldn't know.

"409 C.Q. I beg your pardon. A. I wouldn't know that.

"410 C.Q. Do you make any contention to that effect? A. I don't think so. As I say, I wouldn't know."

On the other hand, the overwhelming weight of the testimony shows that the defendant's operation, without change or the addition of anything new, is exactly what it was in 1925.

Honig testified:

"144 Q. What check had you asked the liberty of making, Mr. Honig? A. I was asking primarily to check the temperature of the filament when it enters the core during the winding operation.

"145 Q. And where had you expected to make those tests? A. The only place tests of that sort could be made was the place where the winding actually takes place, which is Akron, Ohio.

"146 Q. Had that been a part of your request, to secure the liberty of going there and making this check? A. Yes.

"147 Q. Is that what you asked him? A. Yes, for permission to make a check.

"148 Q. And it was in reply to that request that this last letter came? A. Yes."

The defendant's denial to give Honig permission to make these tests, in my opinion, prejudiced the jury against the defendant and caused them to make an unwarranted inference.

The plaintiff, in his brief, states "Now there was clearly no obligation on the part of the company to permit Mr. Honig to make the examination he proposed. * * *"

Honig further testified:

"149 Q. Now at any time after the signing of this license agreement did you make any examination of balls, centers of which had been wound by Goodrich, to see what process they were using? A. I have, regularly.

"150 Q. When you say you have regularly tell me what you mean? A. About every quarter.

"151 Q. During what years? A. 1938, 1939, 1940, 1941.

"152 Q. And based upon the examination of the balls at those dates are you able to come to an opinion about the methods that were used in their manufacture. A. Yes.

"153 Q. And what is your opinion? A. In my opinion they were using my methods of manufacture.

"154 Q. And upon what do you base that opinion? A. From the centers of the golf balls that I bought on the market, and cut it open and examined it.

"155 Q. What did you find there that supports your opinion? A. Well, I found for example, that the thread is substantially in a single piece, there is no breakage in it that would indicate that the filament is the kind that would not respond to the elevation of temperature.

"156 Q. And that led you to the further conclusion—A. In view of my knowledge of golf ball winding it led me to the con-

clusion that the filament was hot, that they put it on hot, and the filament was of such a material that it would respond to temperature treatment."

Honig's opinion testimony that the defendant was using his method of manufacture was far from convincing when weighed against the exhibits and testimony offered by the defendant, especially the operation disclosed in the prior art Schick Patent, No. 1,468,406, Sept. 18, 1923.

Gilbert L. Matthias, General Superintendent of the industrial production division of the Goodrich Company, testified:

"33 Q. Now can you state of your own knowledge when the last improvement or change was made in the Gammeter machine? A. In 1925 we standardized our machines, drawings were completed in the latter part of 1925, and from that time to today we have made no changes in the machine.

"34 Q. Now is that machine, as standardized in 1925, still used by the Goodrich Company? A. It was up to April of this year, at which time the department was closed down due to the direct influence of the government prohibiting golf ball centers.

"35 Q. You mean no golf ball centers are now being made? A. No golf ball centers are now being made.

"36 Q. You spoke of standardizing in 1925, I hand you now two blueprints, the larger of which is designated 47-A-C-2749, and which bears the date 12-16-25. The smaller of which is designated 47-A-C-2450, and dated 10-24-25. Are these some of the standardization drawings of which you have testified? A. They are.

"37 Q. Can you identify these drawings? A. I can.

"38 Q. Can you state as a fact that no later drawings have been made of the parts represented by the drawings? A. I can.

"39 Q. Did the Goodrich Company prior to the time it stopped manufacturing golf ball centers in April of this year manufacture any other centers by any other machines than the ones about which you have testified? A. They did not.

"40 Q. Did it in 1935, or 1936, or 1937, or 1938, or at any other time, manufacture any centers with any other machines? A. They did not.

"41. Q. Do you have one of the machines about which you have testified here in Court? A. I do.

"42 Q. And can you identify that machine? A. I can.

"43 Q. Is this the machine to which you refer (indicating)? A. It is."

The use by the defendant of machines as standardized by defendant in 1925 was corroborated by other witnesses.

On page 280 of the transcript, the following appears:

"132 Q. Mr. Schade, I wish you would come down from the stand, and standing so that the gentlemen of the jury may see as unobstructedly as possible, I want you to explain the operation of the Defendant's machine, which is Exhibit F, and explain it with relationship to the Schick patent, simply to identify it, and, if there are any differences, to point out such differences. I want you to go slowly, and be as detailed as you consider necessary in order that the gentlemen of the jury may understand how the machine operates, if you will? A. I don't know whether you can all see this—

"Mr. Groner: May I interrupt just one minute? The Schick patent, which the witness has, is a part of Defendant's Exhibit D.

"Mr. Goring: If the Court please, perhaps I may assist this by saying I do not now, and will not, raise any question but that this machine is an embodiment of the Schick patent. I am not going to raise any such question."

In Casco Products Corporation v. Sinko Tool & Mfg. Co., 7 Cir., 116 F.2d 119, 121, the court said: " * * * we assert the corollary rule to be that defendant is estopped to assert that patents under which it is licensed merely follow the teaching of the prior art, for to do so would invalidate that which it has covenanted is valid; but that, by the same token, defendant is not estopped to prove that its devices are built wholly according to the teaching of the prior art and that everything necessary to their conception and construction was taught by such art, for such proof clearly negatives infringement. In other words, if everything in defendant's construction was taught by the prior art and nothing included therein other than the application of such art, plus ordinary mechanical skill, then the mere fact that the device con-

structed reads upon the claims of patents, the validity of which it is estopped to deny, does not spell infringement. Our conception of our obligation, therefore, is that we must examine the prior art not only to determine the scope of plaintiff's invention but also to determine whether what is built by defendant springs entirely therefrom. The defendant's position is that its devices intentionally follow its earlier patents and that those patents taught defendant everything necessary to the conception and construction of its devices."

It is my opinion, after seeing and hearing the witnesses and making a careful examination of the record, that the plaintiff has not sustained the burden of proof to show that the defendant's operation is within the plaintiff's patent.

It is my considered judgment that the verdict for the plaintiff is against the weight of the evidence and does not do substantial justice between the parties.

The defendant's motion for a new trial is, therefore, granted, and the judgment entered on January 8, 1943, for the plaintiff, is vacated.