George P. DE JEAN

v.

GREAT AMERICAN INDEMNITY COMPANY.

No. 3977.

United States District Court
W. D. Louisiana, Opelousas Division.

Dec. 6, 1954.

Robert F. De Jean, Opelousas, La., for plaintiff.

Grove Stafford, Alexandria, La., for defendant.

HUNTER, Judge.

This action is one based on negligence and arises under the diversity of citizenship jurisdiction of the court. Defendant, Great American Indemnity Company, was the liability insurer of a third party whose negligence allegedly caused the accident in which plaintiff's wife suffered a fracture of the left leg and subsequently died. The action is brought for her death.

On October 13, 14 and 15, 1954, the case was tried on its merits resulting in a verdict of the jury in favor of plaintiff in the amount of $10,000. At the close of plaintiff's case and all of the evidence, defendant filed motions for directed verdicts. Acting under Rule 50(b), 28 U.S.C.A., the court did not grant the motions but submitted the action to the jury, subject to a later determination of the legal issues involved on the motions. On October 20, 1954, subsequent to the trial and the verdict, the defendant filed a motion to set aside the verdict and to grant to defendant a judgment notwithstanding the verdict. These motions are to be considered together, since the same legal principles are applicable thereto. On October 20, 1954, the defendant filed an alternate motion for a new trial. This motion is to be considered separately, inasmuch as it deals with different legal precepts.

We wish first to discuss the motions for a directed verdict and for a judgment notwithstanding the verdict. No civil engineer would start out on a survey without first finding out how far the survey was to extend. It is just as essential and just as much a time-saver to define in advance the outer limits of the area to be considered in disposing of these motions.

The law applicable to the pending motions has been well set out by the Fifth Circuit Court of Appeals in a case considered on appeal from the Western District of Louisiana (Judge Benjamin C. Dawkins, Sr., trial judge). The language and citation follow:

"As this court has pointed out, a motion for a directed verdict or for a judgment notwithstanding the verdict can be granted only when there is no evidence which, if believed, would authorize a verdict against the movant, while the district judge may grant a new trial when he thinks the verdict is wrong, though supported by some evidence. Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498, 500." Audirsch v. Texas & Pacific Rv. Co., 5 Cir., 195 F.2d 629, at page 630.

This presents only one issue before the court. The question is one of law only; whether there is only evidence, which, if believed, would authorize a verdict against defendant. The motion to set aside the verdict and the motion for a directed verdict, on which decision was

postponed, are to be subjected to the same test.

Defendant is therefore faced with the problem of demonstrating an all-inclusive negative. It must show that in all the record there is no evidence which, if believed, would justify the verdict. On the other hand, from the standpoint of plaintiff, the pointing out by page and line of specific evidence is all that is needed to prove the existence of some evidence on which the verdict was authorized.

The Supreme Court of the United States has expressed this point clearly in a decision also interesting for its emphasis on the point that the drawing of inferences of fact is a part of the fact-finding process. In Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 64 S.Ct. 409, 412, 88 L.Ed. 520, the Supreme Court considered a case involving the questions whether the defendant was negligent and whether such negligence was the proximate cause of the fatal accident. No one knew exactly how Harold Tennant, a railway switchman, had been killed by the train. The jury's verdict was, therefore, based on inferences from the proved facts. The Court of Appeals thought other inferences as to the deceased employee's position and conduct prior to the fatal accident would have been more reasonable. The Court of Appeals declared that there was no substantial proof that the defendant's negligence was the proximate cause of Tennant's death. On certiorari, the Supreme Court summed up as follows:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 571, 572, 10 S.Ct. 1044, 1049, 34 L.Ed. 235 [241, 242]; Tiller v. Atlantic Coast Line R. Co., supra, 318 U.S. [54] 68, 63 S.Ct. [444] 451, 87 L.Ed. [610] 618, 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 [1447, 1448]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

"Upon an examination of the record we cannot say that the inference drawn by this jury that respondent's negligence caused the fatal accident is without support in the evidence. Thus to enter a judgment for respondent notwithstanding the verdict is to deprive petitioner of the right to a jury trial. No reason is apparent why we should abdicate our duty to protect and guard that right in this case. We accordingly reverse the judgment of the court below and remand the case to it for further proceedings not inconsistent with this opinion.

"Reversed."

The identical situation came up in the Fifth Circuit in Huff v. Louisville and Nashville R. Co., 198 F.2d 347, 348, decided July 24, 1952. Here, see what the Fifth Circuit said in the Huff case:

"Summary judgment is not authorized to cut litigants off from their right of trial by jury if there is any genuine issue for the jury's

determination. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967; Chappell v. Goltsman, 5 Cir., 186 F.2d 215, 218. Where negligence may reasonably be inferred even from undisputed facts, it is for the jury to say whether negligence shall be so inferred."

Counsel for defendant is of the opinion that there is not evidence here to justify the jury in reaching its verdict. He says that there is no proof that the lady fell as a result of getting her foot in the crevice, and that the opinion of Judge Hutcheson in Medina v. All American Bus Lines, 5 Cir., 152 F.2d 61, is applicable. We quote from the opinion as follows:

"* * * Plaintiff is here insisting that, though the evidence was entirely circumstantial, it was sufficient to make an issue for the jury. Appellee insists that the evidence shows no more than that there was an accident, and that under settled law the proof that an accident occurred is not proof that it was negligently caused. It insists further that while negligence may be proved by circumstantial evidence, the authorities settle it that the circumstances must be such that an inference of negligence is not purely speculative in its nature.

"We agree with appellee's statement of the law, and a page by page search of the record leaves in no doubt that the evidence showed no more than that a collision occurred, its causes completely unexplained. In this state of the record, a directed verdict for defendant was demanded. The judgment was right. It is affirmed."

Defendant also says that the fall on January 27, 1952 was not a proximate cause of the death of March 22, 1952. We find ourselves almost in accord with him, and will briefly summarize the issues as follows:

Plaintiff is suing for $63,281.14. He is suing for the damages allegedly sustained by him as a result of his wife's death. Hospital, medical and burial expenses amounted to $5,281.14. The pertinent part of the complaint are as follows:

"IV.

"That on January 27th, 1952, at approximately One (1:00) p. m., your complainant's wife, Mrs. George P. De Jean, together with Mr. and Mrs. Frank Montgomery entered the building owned by the said insured, Herbie K. Smith, and which is operated as a restaurant, for the purpose of obtaining a meal. That the said Mrs. George P. De Jean, together with Mr. and Mrs. Frank Montgomery consumed their meal and were in the process of leaving the building of the assured, when the said Mrs. George P. De Jean was approximately at the threshold of the door her left foot apparently slipped a bit and upon placing her right foot down to steady herself, the heel of her right shoe became lodged and held in the crevice at the bottom of the door extending the width of the door from one side to the other and on that portion of the threshold which is slightly raised from the floor, causing the said Mrs. George P. De Jean to fall forward outside of the building, thereby sustaining a serious leg injury which was diagnosed as a fracture of right femur.

"V.

"That the said Mrs. George P. De Jean was immediately taken to the St. Frances Cabrini Hospital in Alexandria, Louisiana and was then removed to Opelousas, Louisiana to the St. Landry Clinic at Opelousas, Louisiana, where she remained for a period of approximately seven (7) weeks, where she remained under care and observance of local physicians treating and caring for her injuries at which time her leg was

placed in traction and subsequently the said Mrs. George P. De Jean was removed to the Foundation Hospital at New Orleans, Louisiana, on March 14th, 1952, where she died on March 22nd, 1952, as a result of the injuries sustained in said accident.

"VI.

"That the said Mrs. George P. De Jean and George P. De Jean your complainants, were legally married and were living together as husband and wife at the time of said accident and that the said George P. De Jean, now 72 years of age and that the decedent was at the time of her death 68 years of age and that the decedent was prior to the accident in excellent health.

"VII.

"That the damages suffered by complainant are as follows:

(a) Pain and suffering $ 8,000.00
(b) Loss of love and af-
    ffection                25,000.00
(c) Loss of companion-
    ship                    25,000.00
(d) Hospital, medical and
    burial expenses          5,281.14
                          _____
Total                     $63,281.14

"VIII.

"Complainant further shows that the accident and resulting damages hereinabove claimed were due entirely to the fault and negligence of the said owner and operator of the said restaurant and that the crack, crevice, gap or opening in the threshold of the said door was the result of improper original construction and accordingly the failure to maintain the premises in a safe condition for those entering said premises in a lawful manner and invited therein for the purposes for which said premises were constructed."

The jury deliberated on this case for three hours and came in with a verdict for $10,000. Its award is evidence that the jury did render a compromise verdict. When one recalls that the medical expenses in the case were in excess of $5,000, it is apparent that the remaining award for the woman's death, for the loss of love and companionship, and the other awards for which plaintiff sued were extremely small.

Let us pass to the issues on which this court believes it very doubtful whether or not there is sufficient evidence to sustain the verdict:

Did this lady really fall as a result of the crack in the floor?

Did the plaintiff prove facts from which the jury could reasonably infer that the crack caused the fall? What is the evidence on this point?

There were two people with the lady at the time she fell, namely, Mr. and Mrs. Montgomery, who were her daughter and son-in-law. Mr. Montgomery did not attempt to state the cause of the fall; so this leaves no one but Mrs. Montgomery upon whom plaintiff must rely to prove his claim of the connection between the crack and the fall. Mrs. Montgomery, who was an eye witness, testified as follows:

"By Mr. De Jean:

"Q. Mrs. Montgomery, you are the daughter of the deceased, Mrs. George P. De Jean? A. Yes, sir.

"Q. You have heard your husband testify that you were along with him and your mother on the date of July 27, 1952? A. Yes, sir.

"Q. I think your husband testified that he went to pay the check—that when you all were leaving he went to pay the check; will you please tell us the best you can what your mother did? A. When he went up to pay the bill my mother and I pushed our chairs from the table and proceeded toward the entrance. She was ahead, and, of course, I followed her, and as she reached the door which opens to the outside of the place and with my right hand I pushed the door of the restaurant open, and, of course, as

she was coming out she was almost to the door and she evidently took a step with her left leg—

"The Court: (Interrupting) The Court hates to interrupt but I would rather that you not testify that she "evidently" did anything. Just tell what you saw.

"The Witness: Well, I judge that when she stepped her foot evidently caught on something, because her fall was sudden and she fell out of the door, and it was raining, and I think I screamed for my husband, and I think someone from the restaurant brought a table cloth, to the best of my knowledge, to put over her to protect her from the rain, and just about that time an automobile stopped in front and Dr. Brian from Alexandria, who later identified himself as Dr. Brian, came to the scene immediately, and I think Miss Coco —I was later told that it was Miss Coco began to using the tablecloth on her, by which time my husband had arrived at her head and assisted, and we were transferred by ambulance to The Lady of Cabrini Hospital. I rode in the ambulance with her to the hospital, where Dr. Brian had his brother, and then later that night she was removed to the St. Landry Clinic at Opelousas.

"By Mr. De Jean:

"Q. Are you able to describe how she fell? A. Yes, sir.

"Q. If so please do so. A. She did not fall in a slipping manner. She fell rather abruptly. Her fall was sudden, to the best of my knowledge. I know she went down and her leg more or less buckled under her.

"Q. Are you able to tell us whether she fell forward, backward, or sideways? A. She fell forward, yes, sir.

"The Court: Mrs. Montgomery, did you see your mother fall?

"The Witness: I did.

"The Court: Would you describe for the jury, to the best of your knowledge, everything concerning that fall.

"The Witness: As I approached the door—the door opens from left to right, and I reached over and opened the door and held the door open with my right arm, and naturally she was opposite on the left of me, and as she almost reached the threshold of the door she stepped with her left foot, and as she reached over to make the step with the right foot she buckled over on the outside.

"The Court: When you say "She buckled over" what do you mean?

"The Witness: She fell forward with her feet under her.

"The Court: With her feet under her, or backwards, or what?

"The Witness: Her feet were behind her. She did not travel with her feet, in other words.

"The Court All right.

"By Mr. De Jean:

"Q. You say she fell forward outside? A. Yes, sir.

"Q. Do you know where her feet were with relation to the location of the steps of the building? A. After the fall?

"Q. After the fall. A. Her feet —her right foot, I believe, was slightly under her, and her left foot in a bent position, bent under and I imagine about a half foot from the step of the restaurant.

"Q. From which step? A. From the bottom step going out of the restaurant as you step down.

"Q. Did you have occasion to notice this shoe at that time? A. At that particular moment?

"Q. Yes. A. No, I did not.

"Q. When was the first time that you did have occasion to notice this shoe? A. When the Sister at the Cabrini Hospital removed it from her foot.

"Q. You mean the Nun? A. The Nun.

"Q. Was this shoe given to the family? A. Yes, it was handed to to me.

"Q. Is this shoe in the same condition now that it was in at the time that it was handed to you at the Cabrini Hospital? A. Yes, sir.

"By Mr. Stafford:

"Q. Mrs. Montgomery, I wish you would tell the Jury and the Court, and me, if you can, the name of every doctor that you can remember who examined and treated your mother between the time she slipped and the time of her death? A. Well, the first doctor was Dr. Brian, who arrived on the scene and told us he had a brother in Alexandria at the hospital. And we requested a specialist, a bone specialist, naturally after we found that there was a break, and he said that the bone specialist from Alexandria was out of town that week-end and his brother assisted him, and he called his brother over. I don't remember his name. I am not positive.

"In Opelousas there was Dr. Rozario. He treated her, and I believe that some other doctors in the St. Landry Clinic saw her also.

"Q. May I recall some of the names of the doctors and ask you if she was examined probably by them. How about Dr. Ramagosa? A. No. I know what you have in mind. In fact Dr. Rozario took X-rays during her stay in the hospital. I don't know what happened, but I do recall I took the X-rays to Dr. Ramagosa to be read for Dr. Rozario.

"Q. How about Dr. Frost? A. He was called in on consultation with Dr. Rozario.

"Q. After she went to Oschner's tell us the names of the doctors that treated her down there, or examined her down there? A. I think the case was in charge of, or in the hands of—I don't remember that bone doctor's name. I talked to him every day, and I should recall his name, but Dr. Benjamin is his assistant.

"Q. You had Dr. Benjamin? A. He was assistant to the bone specialist, whose name I can't recall now. I would not be certain about his name.

"Q. How about Dr. Wise? A. He called on her.

"Q. Do you remember Dr. Heintz? A. No, I don't remember Dr. Heintz.

"Q. Dr. Perretz? A. No, sir.

"Q. Or Dr. Neely? A. No, sir. There were a lot of doctors, but those were the only ones that I personally knew to name them by name.

"Q. Mrs. Montgomery, had you ever been to Herbie Kaye's Restaurant before the date of this accident? A. I don't remember. I might have. I don't recall.

"Q. Have you ever been there since? A. No, sir.

"Q. Had your mother ever been there before? A. I don't know, sir. If she had she hadn't been with me.

"Q. Now, you and your husband and your mother parked this car outside of the cafe in the rain and walked over the ground part of the entrance on to the concrete walk and in the front door, is that correct? A. Yes, I am sure that we went in.

"Q. And you came out that same door? A. Yes, sir.

"Q. Mrs. Montgomery, you have a bad ankle, do you not? A. Yes, sir.

"Q. Could you tell us approximately your weight? A. I can tell you my weight, but I can't tell my height. One hundred and sixty-three pounds is my weight, but I don't know my height.

"Q. Now, Mrs. Montgomery, you don't know what caused your mother to fall, do you? A. No, sir,

I don't know. I was not anticipating this.

"Q. I understand that, but I just asked you the question. A. But I think I know the answer.

"Q. We don't want any guessing, Mrs. Montgomery. I just want to know what you know. You do not know the cause of your mother's fall, do you? A. No.

"Q. Now, after this accident was all over your mother was laying out on the ground, was she not? A. Yes, sir.

"Q. And Mrs. Smith and a number of the employees came out to assist you with your mother to cover her and try to help you with her? A. I remember the tablecloth being brought out. I also remember her dress kind of being rumpled up, and I helped to smooth it.

"Q. Do you remember anybody else there? A. No, I don't remember their names. * * *"

If the jury can infer from this testimony that the crack caused the fall, then from that fact alone the jury would have been justified in inferring that the crack was too wide, made the door unsafe, and on the basis of such fact and such inference, could have held the cafe owner negligent. There is also the evidence in the record that the lady's shoe shows that the heel was torn off of it. But there was no evidence in the record as to the condition of this shoe prior to the accident. There is nothing to show that this shoe might have been this way for several days, or that the shoe situation could not have been made by the step or the sidewalk, in the ambulance or on the stretcher.

There is also the testimony of Mr. George P. De Jean, who stated that shortly after the accident he measured the crevice and it was nearly an inch across. He did not tell us how he made the measurement, with what he made the measurement, and he had no written records in connection therewith.

The second issue, which we deem precariously close is: Has plaintiff proven that his wife died as a result of this fall? The law of Louisiana requires plaintiff to prove by a preponderance of the evidence that the fall and the injuries she sustained thereby were a proximate cause of her death. Plaintiff submits that the proof falls far short, and that Mrs. De Jean died nearly two months after the accident of a combination of illnesses, bodily ailments and diseases all totally unconnected, so far as the evidence goes, with a broken leg. Neither Dr. Lynch nor Dr. Lazario would state the exact cause of her death. The autopsy report shows the following:

"Final anatomical diagnosis

"1. Traumatic fracture of shaft of right femur.

"2. Acute and subacute enteritis and colitis, non-specific.

"3. Fatty degeneration of liver, severe.

"4. Degeneration and hemorrhage of adrenal cortex.

"5. Acute hemorrhagic splenitis.

"6. Post operative iliostomy.

"7. Cardiac hypertrophy slight to moderate, 460 gms.

"8. Arteriosclerosis, slight."

Neither doctor would say that the broken leg caused the death nor that it caused the ulcer from which the woman suffered, nor that it caused any other bodily ills shown on the autopsy report. There is no evidence that the leg was ever infected, caused fever or gave any trouble of any kind. We quote the following from Dr. Lynch's testimony which we believe is pertinent:

"By Mr. De Jean:

"Q. My question is: could not we say that her death was a result of a continuous chain of events which had their inception with the traumatic fracture of the shaft of right femur? A. Yes, I think her death was the result of a sequence or resulted in a climax from a series

of events, which from her history, started with a fracture of the leg.

"Mr. De Jean: That is all.

"Mr. Stafford: I want to ask some question.

"Recross Examination

"Q. Doctor, you don't mean by that, though, that you are testifying that the fracture of the leg caused these various bodily ailments from which the lady finally died? A. That's right. As I stated previously, the same sequence of events might have started by any one of a number of things.

"Q. Didn't you tell me it could have started from an ordinary common cold? A. That is true.

Redirect Examination

"By Mr. De Jean:

"Q. Assuming that she was considered a well person when she entered the St. Landry Clinic, the subsequent findings, as shown by the autopsy, certainly were not present in the condition they were found, when she entered the St. Landry Clinic, if she was considered a well person when she entered it? That is the colitis—let me name them. That is the acute and subacute enteritis and colitis, the acute hemorrhagic splenitis? A. Had they been present, they would have been noted on her initial examination.

"Mr. De Jean: That is all, Doctor."

Does the above quoted testimony of the doctor justify a conclusion that the lady's death was caused by the fall? Does the testimony of Mrs. Montgomery, the daughter of plaintiff, justify an inference that the lady fell as a result of the crevice? Where does speculation end and a reasonable inference begin? Is this a case of reasonable inferences, or is it a case of speculation, such as Judge Hutcheson spoke of in the Medina case? Is this an instance where the jury ignored the evidence and brought in a verdict upon grounds that were not sub-stantial, such as Judge Porterie set aside in Allen v. Texas and Pacific Ry. Co., D.C., 96 F.Supp. 520, 521?

This court certainly believes that the verdict here was *overwhelmingly* against the weight of the evidence. This court has the greatest hesitancy in interfering with jury verdicts, and even a greater hesitancy in concluding the matter by directing a verdict, as was done in the Allen case. We, therefore, hold as a matter of law that the testimony of Mrs. Montgomery, together with the testimony of Mr. George De Jean to certain facts permitted the jury to draw inferences that decedent did fall as a result of the crack, and that the crack made the entrance unsafe. We likewise hold, as a matter of law, *though there is certainly room for a valid difference of opinion,* that the appearance of other diseases after the accident warranted an inference of casual relationship between the fall and the diseases without the benefit of medical testimony.

Alternate Prayer for a New Trial.

When we took under advisement the motions for a directed verdict, we felt then that these motions would likely have to be later sustained. However, on further examination we have refused to so do. There still remains the alternate prayer for a new trial. Under the provisions of the Federal Rules of Civil Procedure and the interpretations thereof found in the cases of Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147, and Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498, we shall proceed to the alternative plea for a new trial.

It is the duty of the trial judge to set aside the verdict of the jury and grant a new trial if he is of the opinion that the verdict is against the clear weight of the evidence, or will result in a miscarriage of justice, even though there may be some substantial evidence which would prevent the direction of a verdict. In Marsh v. Illinois Cent. R. Co., 5 Cir., 1949, 175 F.2d 498, 499, a fireman brought a personal injury action,

charging negligence. There was a verdict for the plaintiff, and the defendant moved for a judgment notwithstanding the verdict, which was granted on the ground as stated by the trial judge:

> " 'The weight of the evidence is so overwhelming against the plaintiff that as a matter of law it becomes the duty of the court to withdraw the case from the jury and enter a judgment for the defendant. The motion for a new trial will be denied, and the motion of the defendant for a judgment notwithstanding the verdict of the jury will be entered * * *.' "

In refusing to grant a new trial in the event of reversal by the Court of Appeals, the judge said:

> " 'It is my judgment that the evidence was insufficient to go to the jury, but if I am wrong in that, then I do not think a new trial should be granted as there were no other errors of law.' "

The Court of Appeals held that the trial court erred in granting a motion for judgment notwithstanding the verdict, for there was some evidence which should have gone to the jury, and then remanded the case to the lower court, with directions that a new trial be granted, if the trial judge:

> "continues to think of the verdict to be against the overwhelming weight of the evidence."

In remanding the case, the Court of Appeals said:

> "While it is not our function to weigh the evidence, we do agree with the trial judge's first expressed opinion that the weight of the evidence is 'overwhelmingly against the plaintiff'. But we do not agree that the grant of a judgment notwithstanding the verdict was therefore justified. There was evidence of the appellant, not very explicit or positive, which if believed might authorize a jury to conclude he was hurt in the manner he claims. Be-cause the trial judge does not believe it, because of appellant's own contradictions and conduct and of opposing evidence which seem to overwhelm it, is not ground for a judgment notwithstanding the verdict, and we must reverse that judgment. Howard v. Louisiana & A. R. Co., 5 Cir., 49 F.2d 571.

> "3. But it is ground for the trial judge to grant a new trial, though the trial was free of other error. He has in strong terms disapproved the verdict as contrary to the evidence, so much as to warrant setting the verdict aside and entering judgment for the defendant. We have reversed the entering of a final judgment, but it is evident that the new trial ought to be granted and would have been except for the misconception that absence of other error prevented it. The full discretion vested in the trial judge not having been exercised, we will remand the case with direction to the judge to grant a new trial instead of a judgment notwithstanding the verdict if he continues to think the veridct to be against the overwhelming weight of the evidence."

The Marsh case was cited with approval on the question just discussed, in the case of Audirsch v. Texas & Pacific Ry. Co., 5 Cir., 1952, 195 F.2d 629, 630.

Mrs. Montgomery, the eye witness plaintiff called to the stand, did not see a crack, nor did she know what caused the fall. True, she did say that her mother's heel apparently and evidently caught in the crack. It is true that the court has held this testimony of Mrs. Montgomery sufficient upon which the jury could base an inference that the crack caused the fall. But this was held to be a reasonable inference only by finding as a fact that the crack was indeed a wide one, and the only direct evidence on this from the plaintiff's point of view is that Mr. George De Jean,

Jr.[1] established that shortly after the accident he measured the crevice and it was nearly an inch across. He did not state how he made the measurements, or with what he measured. He had nothing but a memory that he was using as a basis of his observation made several years previous. We feel that the plaintiff could have proven the existence of a large crack by other witnesses, and perhaps by Mr. and Mrs. Montgomery who were actually there. On the all-important question as to whether the crack was a large crack, or was the same crack[2] which was shown to the jury, the evidence is overwhelming. Against the testimony of Mr. De Jean of this question, we have the testimony of many persons. These persons testified from observation and personal knowledge. Mr. Smith and his wife said that the crevice on the date of the accident was the same as it was in May of 1948 and in October of 1954. Sidney J. Ducote, the carpenter who installed the door, testified to the same effect. The tile man, Fred White, also testified to the same effect. The insurance adjustor and ten employees said the same thing. All of these witnesses agreed without dissent that the crevice as they saw it in court was the same as in 1952 when the accident happened, and the same at all times back to 1948 at the end of the first re-modelling job. To say that plaintiff established his claim that a change had been made in the threshold following this accident is simply to say that all of these persons' perjured themselves. There is no explanation short of that.

According to the uncontradicted evidence in this case, some 250,000 people have passed through this door. And use was without complaint or incident. This is very strong proof that the door was reasonably safe.

Our appreciation of the case is that it is conceded that the door was reasonably safe in July of 1953, and in October of 1954, and since the proof overwhelms that the crevice as it was presented to the court and the jury is the same crevice that existed at the date of the accident, and since we agree that the jury must have found that a change had been made in order to charge defendant with negligence, we feel that it is inescapable that the jury's finding is here against the overwhelming weight of the evidence.

There is another matter upon which we desire to comment. The court refused to admit into evidence early in this case defendant's Exhibit "D–1", which reads as follows:

"Law Offices
"Robert F. De Jean
"Telephone 3820

"160 W. Bellevue Street
"Opelousas, La.
"February 4th, 1952
"Bradford Insurance Agency
"Alexandria, Louisiana

"Re: Claim, George P. De Jean
"Gentlemen:

"I am writing you with reference to a recent accident which occurred at Herby K's Restaurant at Alexandria, Louisiana, which resulted in a compound fracture of the claimants leg, when she slipped in the door way, while walking out of the restaurant.

"I might at this time suggest that these people are not assuming the position of demanding an outrageous sum of money, but instead feel that an easy settlement could be made, should the adjuster for your Insurance Company call at this office. I would appreciate having this letter forwarded to the adjust-

---

1. We do not mean to ignore Mr. D'Avy's testimony, but we, like him, have to admit that his (Mr. D'Avy's) opinion was somewhat a guess. It is appreciated that Mr. D'Avy was fair and frank with the court,

but such speculation is given no probative value.

2. The words "crevice" and "crack" are used interchangeably in this opinion.

er, in order that he may be placed on notice of this claim.

"Yours very truly,
"s/ Robert F. De Jean
"Robert F. De Jean"

The court now believes that for the purpose only of showing what caused the fall, that it should have admitted the letter because it now appears to be the only direct evidence on the subject. The letter was written five days after the accident. Plaintiff's counsel stated therein *not* that the lady caught her foot in the crevice, but that she slipped in the doorway.

■ As to the cause of Mrs. De Jean's death, the medical testimony as we interpret it is also overwhelming against plaintiff. But we have refused to set aside the verdict and grant a judgment notwithstanding the verdict on this issue because of our heretofore expressed belief that the appearance of the other diseases after the accident warranted an inference of causal relationship. We do point out, however, that there were numerous other doctors who treated Mrs. De Jean, and we believe the record should contain some evidence as to their opinions.

I am of the opinion that a new trial, rather than a final termination of this case, would better serve the ends of justice here. It is therefore ordered that the verdict be set aside and that a new trial be granted. My reasons for taking this action are:

(1) The verdict is overwhelmingly contrary to the clear weight of evidence, and this action is necessary to prevent a miscarriage of justice.

(2) The verdict is obviously a compromise verdict, and does justice to neither party, for if the plaintiff is entitled to recover, certainly he is entitled to recover in excess of the amount here awarded.

(3) Other evidence should be available as to the cause of the death and also as to the cause of the fall.

(4) The court erred in not admitting defendant's Exhibit No. 1 into evidence for the purpose of proving the cause of the fall. (However, I wish it understood that the motion for a new trial would have been granted regardless of the court's ruling on defendant's Exhibit No. 1).

Authorities in support of the action here taken by the court are: Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147; Marsh v. Illinois Cent. R. Co., 5 Cir., 1949, 175 F.2d 498; Childs v. Radzevich, 1943, 78 U.S.App.D.C. 235, 139 F.2d 374; Hawkins v. Sims, 4 Cir., 1943, 137 F.2d 66; General American Life Ins. Co. v. Central Nat. Bank of Cleveland, 6 Cir., 1943, 136 F.2d 821; Rice v. Union Pac. R. Co., D.C.Neb.1949, 82 F. Supp. 1002; Pistolesi v. Massachusetts Mut. Life Ins. Co., D.C.Cal.1945, 64 F. Supp. 427; Boston & M. R. R. v. Cabana, 1 Cir., 1945, 148 F.2d 150, certiorari denied 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991; Fitzgerald v. Pennsylvania R. Co., 2 Cir., 1947, 164 F.2d 323; Bergstrom Paper Co. v. Continental Ins. Co. of City of New York, D.C.Wis.1948, 75 F.Supp. 424; Honig v. B. F. Goodrich Co., D.C.R.I.1943, 52 F.Supp. 281; Bopst v. Columbia Casualty Co., D.C.Md.1940, 37 F.Supp. 32; Sampson v. Channell, D.C.Mass.1939, 27 F.Supp. 213, vacated on other grounds 1 Cir., 110 F.2d 754, 128 A.L.R. 394, certiorari denied 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415, second case, new trial denied D.C., 27 F.Supp. 213, affirmed 1 Cir., 108 F.2d 315, first case.